GEORGE H. WALLER, Appellant, v. MADELINE GEORGE.—16 S. W. (2d) 63.

Division One, March 29, 1929.

574

*James H. Hull* for appellant.

*Terrence Riley* and *A. D. Gresham* for respondent.

ELLISON, C.—Suit in equity to enforce an oral contract to convey a farm of 160 acres in Platte County, and for partition of another tract of 120 acres in the same county—both left by the plaintiff's intestate father, Fountain L. Waller. The answer of the defendant, a daughter, included a general denial, a plea of the Statute of Frauds and appropriate affirmative allegations coupled with a prayer for partition of the entire 280 acres. The circuit court found for the defendant denying specific performance and ordering partition.

Commissioners were appointed, who awarded the 120 acres to the daughter and the 160 acres to the son charged with the payment of

$750 to the daughter to equalize the two distributive shares. This report was set aside and new commissioners were appointed, who reported the land could not be divided in kind. Thereupon the court ordered a partition sale, which was made.

The case was tried in March, 1925. Over two months thereafter, in June, 1925, when the second report of commissioners was filed, the plaintiff asked to have the case reopened so he might offer evidence showing the character and value of the improvements he had put on the 160 acres, to the end that these might be taken into account in making the partition. The request was refused, as was, also, his offer to prove the improvements was worth $3000. Still later, in September, 1925, some six months after the trial, the plaintiff filed a second amended petition alleging the improvements aforesaid were of the value of $2905, and praying that allowance therefor be made in the partition proceedings if specific performance was denied. This petition was struck out by the court.

The plaintiff appeals, complaining that the court erred: (1) in refusing to decree specific performance; (2) in setting aside the first report of commissioners, awarding the 160 acres to the appellant charged with the payment of $750 to the respondent; (3) in failing to allow appellant credit for the improvements he had put on the 160 acres, and in refusing to hear testimony as to the value thereof.

As will be surmised from the foregoing, practically all the evidence was directed to the specific performance branch of the case, and had to do with the making and terms of the alleged contract and the performance thereof by the appellant and his family. As pleaded the contract was as follows:

"Plaintiff further states that in the year 1914, the plaintiff and his father, the said Fountain L. Waller, entered into an oral agreement whereby said Fountain L. Waller promised and agreed that if the plaintiff would let him, the said Fountain L. Waller, live with him as long as he should live, and make his home with the plaintiff, and give him such care and attention as he might need, and also take care of a horse which the said Fountain L. Waller then owned, he, the said plaintiff should have the use and income from the above described 160 acre tract of land, and at the death of the said Fountain L. Waller, he, this plaintiff, would become the owner and take the title to said 160-acre tract."

The 160-acre farm was the family homestead. The 120-acre tract was a detached body of prairie land all in grass except a few acres. The appellant lived on the home place with his father, the intestate, and when married in 1899 brought his wife there. By 1912 they had four children, and the appellant's whole family of six lived with the intestate, who was nearly eighty-seven years old when he died in June, 1924. He had been a widower for many years.

Prior to 1912 some of the testimony is that the appellant paid the deceased rent on the 160-acre farm. There is other testimony that they farmed the land together. Whatever may be the fact about that, it appears that in 1912 the deceased became interested in pure-bred shorthorn cattle and bought some. The testimony on both sides is that about that time the appellant and the deceased made an arrangement by which the appellant took charge of the farming of the home 160 acres (though the deceased continued to live there) and the cattle were put over on the 120 acres.

Two years thereafter, in 1914, the alleged contract involved in this case was made. This was ten years before the contract was brought into question by the death of Fountain Waller in 1924. The direct testimony concerning it comes from the appellant's wife, Mrs. Lillian Waller, and his two daughters, Mrs. Bernice Perry and Mrs. Louise Liepard. All of them testified they were present and heard the agreement.

Mrs. Waller said: "We wanted to build—the family was getting so big, we wanted to make the house bigger; and Mr. Waller says, 'Just go ahead. This place is yours, and build what you want to on it.'" After some repetitions and objections by opposing counsel, she continued: "Well that is all I can remember at that time. Mr. Waller has always said he was to live with us—all he wanted there was a home with us, and we was to take care of him. . . . He just wanted to live with us, and be one of the family, and be taken care of when he was sick, and have his cooking and everything done . . . He wanted us to feed his horse—take care of his horse— and furnish his food, and take care of his clothes, and his room, and do his washing, and take care of him when he was sick."

Further on in her testimony this witness stated she had heard the deceased talk about making a will and that he said he wanted to avoid trouble—he was going to make a will and that he wanted to will Edward (who we understand was one of the appellant's children) forty acres of the 120-acre tract. She also testified she had heard the deceased say to his old friends, "Well, this place is George's, and he can do just as he pleases with it."

The daughter, Mrs. Bernice Perry, gave her recollection of the conversation. She was nine years old at the time. She said: "Well, Daddy wanted to build an addition to the house because he thought we needed more room, and he asked Grandpa about it; and he told him to go ahead and build what he thought was necessary because in later years he would turn the place over to him, provided he took care of him and his horse during his lifetime—the place would be his at his death."

The other daughter, Mrs. Liepard, was eleven years old in 1914 when the alleged contract was made. Her testimony, condensed some,

was: "He" (the appellant, her father) "thought we needed more room, and he wanted to build an addition to the house; and grandfather told him to go ahead, and fix the place—that it would be his some day—upon his death . . . ; that he could have the place then to live there, and take care of him, and have the proceeds from the place during his life, and at his death the place was his. . . . My father was to take care of grandfather all during his life, during sickness, and was to feed him. . . . Grandfather said for him to go ahead and build on to the house; that it was to be his . . . upon his death. And that it was to be—he was to get the proceeds from the place during his lifetime if he would take care of him, take care of his horse, and take care of him during sickness, and supply his food for him."

The testimony for appellant was that on faith of the alleged contract he proceeded during the same year to enlarge the dwelling house by building two additional rooms at his own expense. The work was done by John Rader, a contractor and builder, who testified that shortly after he commenced the job the deceased said to him:

"He said that he thought that George wanted a little more room, and he told him to go on and build it; that he wasn't going to build it—he wasn't going to put no more on the farm; that he had turned it over to George, and gave it to him, and it was George's now—is the way he told me."

But a little later this witness put it this way: "He said that it was—'It is George's,' he said, 'at my death. I have turned it all over to him;' he. says, 'I have got nothing more to do with the place.' "

And then again he said: "Q. Just repeat his language—what he said in that connection. A. Well, he says, 'I have turned this all over to George, and he has charge of the whole business—of this whole place now. It is 'hissen,' and belongs to him, and I haven't anything more to do with it. I am not building nothing here. I ain't having this work done.' "

James A. Hulett and Ad. Rader were carpenters who worked on the same job. The former testified the deceased said the farm was George's (the appellant's) and that he (the deceased) didn't. have anything to do with the work; that "it was George having this built, and George could fix it the way he wanted it—it was his." The latter witness stated the deceased told him he had turned the farm over to George and George was having the work done on the farm now and paying for the building work. This same witness said later in his testimony: "Well, he said that the home place was George's, and that this other place—he was going to give to Madeline, his daughter." This daughter was the respondent, and the "other place" referred to was the 120 acres.

Another witness for appellant was David Losey, a neighbor and old friend of the deceased. Mr. Losey had been away, out of the neighborhood, for several years, and on his return in 1915 noticed the addition to the house. He remarked to the deceased that he observed his improvement of the dwelling and the following conversation occurred: " 'No,' he said, 'I haven't built anything.' He said, 'George built that.' He says, 'I have turned the farm over to George, and he had to have more room as his family is getting quite large, and there wasn't room enough for him and his family, and for myself.' And he said, 'I have turned the home over to George—the home place. At my death, he is to have the home place for taking care of me and my driving horse, and what other little stock—whatever little there might be—is to be on the place—at my death.' " Further this witness quoted the deceased as follows: "He said he wanted George to have the home place, as he was the only male heir of the Waller generation; that he wanted the home farm kept in the Waller name."

Another witness, Herb Perry, said that in the spring of 1923, a little over a year before Fountain Waller died, the two were walking about the home place and came to some cherry trees. The witness stated the deceased said to him: " 'If you don't have enough, George may let you have some cherries.' He spoke up that it was George's, and they wasn't his."

The witness Noah Wills testified to another incident which occurred, apparently, soon after the intestate had bought the shorthorn cattle in 1912 and before the alleged contract was made in 1914. The latter said to the former: "He thought he would buy a few cows, and put on his grass out on the prairie, and George—he said he turned the farm there over to George, and he thought he would attend to that out there by himself." As the context shows, this witness meant the home farm had been turned over to George, and the shorthorn cattle were to be kept on the 120 acres. Continuing, the witness reported the conversation as follows: "I said he was getting awful old to go in the thoroughbred business. Ain't George interested with you? And he said, 'No, he is going to take the home himself'—George was—I didn't know whether George liked it, or not. I asked if George like registered stuff, and he said he didn't think he did. And he said he just turned the other place over to George. He didn't say he gave it to him. He turned it over to him to farm. George farmed it different than what he did."

T. B. Duncan was an uncle of the appellant's wife. He said he had moved from Platte County to Vernon County and in 1921 returned after a seven years' absence. One morning he was at Fountain Waller's home and commented on the addition to the dwelling house. The following occurred: "Then he (the deceased) proceeded

to tell me he thought that I ought to know, or did know, that he had done give the farm to George, but I didn't. That was my first intimation that he had given it to George. . . . He says, 'I have give this farm to George—this 160 acres of land, and I told him to build all he wanted to build on it' . . . . He said that he was getting old, and needed attention, and that he had turned it over to George; that there was an agreement between he and George that George was to take care of him and his horse in his lifetime for this farm.''

At this stage of the case Mrs. Lillian Waller, the appellant's wife, who had been the first witness, was recalled to the stand after seventeen other witnesses had testified, and was asked if she recalled anything else that was said in the conversation between the appellant and her father, beside what she had already told. The following are the questions propounded by counsel and her answers:

''The Witness: Well, I remember George saying that it was all right with him—the contract.

''Q. And what else, if anything else, that you remember that Mr. Waller said than what you stated this morning? A. Well, he told him to take the place, and do just as he pleased with it; that it would be his at his death.

''Q. That is, Mr. Waller said that? A. Yes, his father.

''Q. If you think of anything else that you think you didn't say this morning—do you recall anything else that Mr. Waller said he wanted George to do for him? A. Well, he wanted him to take care of him in his lifetime, and take care of his horse.

''Q. Do you think of anything else, Mrs. Waller? A. Well, he said he wanted to live there with us, and have that for his home.

''Q. Yes. A. And George take care of him, and all, and me cook for him.

''Q. When he got through with making those statements, what did George say to him? A. Well, he said he would do that. He said it was all right; he would do that.

''Q. Do you think of anything else that you have left out of the conversation, Mrs. Waller? If you do, why, just tell the court about it? A. Well, I don't believe I do.''

The foregoing fairly well summarizes the evidence for appellant on the making and terms of the contract. It was followed by proof that the plaintiff thereafter exclusively managed the home farm, rent free, and made improvements thereon, including the two-room addition to the house hereinbefore mentioned; that he dug a cistern, built a garage, recovered the house and barn, painted and papered the house, painted the other buildings, built fences, put out an orchard, and cut and sold $800 worth of walnut logs, all with the knowledge and consent of the deceased. A number of witnesses were

produced who worked at these various tasks or figured in the trans-actions involved and it was shown by them that they received pay from the appellant. It was also shown that some smaller improvements were constructed on the 120-acre farm and that these were paid for by the deceased.

In addition to this there was testimony that the deceased was frail and had sick spells every once in a while and that he was compelled to have his teeth extracted. As a result of these things he required especial attention in the way of having medicines administered and special foods prepared. In 1915 he was compelled to go to a hospital in St. Joseph where he had an operation. During all this time the appellant and his family were attentive to the intestate and he expressed satisfaction with their treatment of him.

The evidence for the respondent was that the appellant occupied the home farm from 1914 until the death of Fountain Waller under an agreement that he was to have the *use* of the farm without payment of rent, and it was contended the contract did not provide that the *title* was to be vested in the appellant at the death of the intestate or at any other time, otherwise than as he might take by inheritance.

The first witness for respondent was her husband, Claude George. He said that in the spring of 1918 the appellant talked to his wife, the respondent, in his presence, and told her that he had a contract with the intestate whereby he was to get the use of the 160-acre farm as long as the intestate lived, for taking care of him, taking care of his horse, keeping up the improvements and paying the taxes. The appellant made the same statement in the witness's presence again in 1923.

After Fountain Waller died the matter of settling the estate came up. The respondent suggested to the appellant that she thought both ought to administer and the appellant agreed. She then asked him if Fountain Waller had left a will and the appellant answered that he had not, saying, ''We will just divide this up between us equally.'' A little later the appellant suggested to the respondent and the witness, her husband, that he thought the 120-acre tract would sell for as much as the 160-acre farm, and he offered to give the respondent a deed for the 120 acres if she would give him a deed for the 160 acres. The respondent refused. Shortly after that the appellant suggested to the respondent that they sell both farms and settle the estate that way. She consented, but nothing was ever done about it.

The respondent substantially corroborated the testimony of her husband on these matters. She also testified that after the intestate bought the shorthorn cattle in 1912, her brother, the appellant, told her he didn't think the deceased should have bought the cattle and

that he was going to keep the cattle upon the 120 acres, and that the deceased had told him he could have charge of the home place during the former's life without paying any rent. After 1914 the appellant talked to her again and said the arrangement was for him to occupy the home and make what he could off of it without paying rent, except that he was to take care of the deceased, and see that he had a comfortable home.

She further testified that when the estate was in course of administration the appellant told her they would divide everything equally and they had the land appraised, but the appellant wasn't satisfied because the 160 acres was appraised for more than the 120 acres, when he thought they were of equal value. At that time he suggested that they exchange deeds, she conveying to him the 160 acres and he to her the 120 acres. When she refused, he proposed that they put the land up and sell it, and she consented; but when her husband told the appellant that he would bid on the 160 acres it seemed the appellant backed out.

Finally she saw the appellant in Platte City one day and asked him if he had ever come to a decision as to the method of making a division and the appellant told her he guessed they could not agree. She proposed they have a conference that afternoon, and he declined because of other pressing business, but said he would meet her the next morning. When she came to town the next morning she was served with summons in the suit.

In addition to this the original petition in the case was introduced in evidence. In this petition the contract pleaded and relied on provided that if the appellant should render the various services specified the 160-acre home farm should be his "and that plaintiff should receive the same *as and for his share and portion of the real estate* of said Fountain L. Waller." (Italics ours.) Among the duties imposed on the appellant by the contract thus pleaded, one was to attend to the intestate's washing, and keep his clothing in proper condition; and it was further pleaded that in performance of the contract the appellant paid all taxes on the 160-acre farm after the agreement was entered into. The contract as pleaded in the original petition differed from the one set out in the second amended petition in the particulars just mentioned.

It was further shown that when the estate of Fountain Waller was administered in the probate court both the 160-acre farm and the 120-acre farm were inventoried under oath as a part of his estate, the inventory reciting that it was made by the appellant and the respondent and the three appraisers designated therein. Thereafter the estate was appraised for the state inheritance tax, the value of the 160 acres being fixed at $14,400 and the value of the 120 acres at $10,000, and the value of the distributive share of each of the two

heirs—that is, the appellant and the respondent—was shown to be an equal one-half of the whole estate. It was also shown that shortly after the death of the intestate the appellant gave a deed of trust on his *undivided* interest in all the lands left by the deceased to secure a note for the sum of $11,000.

In addition to this there was testimony that during the last days of the illness of Fountain Waller the appellant bought a mattress and some bed clothes for the former's use and gave some checks therefor signed, "F. L. Waller by G. H. Waller," and that the checks were afterwards turned down at the bank. It was shown also that the appellant gave a check on his father to pay a hired man who worked during the last illness of the deceased while the appellant was busy taking care of him. There was also evidence that for several years toward the latter part of Fountain Waller's life the taxes on the 160-acre farm were paid by him instead of by the appellant, and there was scattering evidence that other expenditures connected with the farm operations on the 160 acres were paid in whole or in part out of Fountain Waller's bank account; and that some shoes for the appellant's family were paid for by Fountain Waller; and that he paid for some of his laundry work and mending. In addition to this some of the neighbors testified that the improvements on the 160-acre home farm had not been kept up in very good shape by the appellant. We do not need to go into this class of testimony extensively.

Finally in rebuttal the appellant, George Waller, was called to the stand in his own behalf. Up to that point in the trial he had not been offered as a witness because of his disqualification under Section 5410, Revised Statutes 1919, the other party to the contract and cause of action at issue and on trial being dead. He was asked if he had had the conversation with the respondent and her husband Claude George to which both had testified, in which he told them he was to have the *use* of the home place without payment of rent in return for services to be rendered by him to his father. It is hard to tell what the appellant meant by his answer to this question. He said: "I never did while Pa was living. I did after he died." This appears on its face to be an admission by appellant that he told the respondent and her husband he was only to have the *use* of the place; but later in his testimony he says he told them in this conversation that he was to get the home place at Fountain Waller's death.

The appellant also admitted on the stand that he had made an offer to the respondent to let her have the 120 acres if she would let him have the 160-home place, but he explained that he meant this merely as an offer in compromise or settlement of their dispute.

On cross-examination he was asked why he had stated in his original petition that under the contract he was to get the 160 acres

as his share of the estate, whereas in the second amended petition on which the case was tried he sued for the 160 acres and for a one-half interest in the 120 acres as well. The next question was: "When did you change your mind as to the right and justice of that?" and he replied, "Since I talked to the lawyers."

I. We shall not attempt even to refer to all the authorities cited by the parties in their briefs. The rules governing courts of equity in the enforcement of oral contracts for the conveyance of land as against the Statute of Frauds, in cases such as this, are restated at length in Walker v. Bohannan, 243 Mo. 119, 136, 147 S. W. 1024, 1028, and (quoting from that case) in Snuffer v. Freeman (Mo., Div. 2), 274 S. W. 37, 41, and Hoehn v. Hoehn (Mo., Div. 1), 297 S. W. 954, 958. Measured by these rules we think the judgment should be affirmed, for, in our opinion, this case typically illustrates the evils at which the Statute of Frauds was aimed. Without going over the evidence again at length, our conclusions may be summed up by saying that the testimony for appellant falls short of producing that degree of conviction which the law requires in such cases, either that the contract pleaded was proven, or that the terms thereof were clearly and definitely shown, or that the alleged acts of performance were referable solely to the contract sued on.

The direct evidence as to the contract came from the appellant's wife and his two daughters, one of whom was nine years old and the other eleven when it is alleged to have been made. Their testimony was given eleven years afterwards. It was an attempt to narrate what was said at a family conference. Mrs. Waller's testimony as a whole is not clear and does not convincingly prove the arrangement was contractual. And as to the testimony of the two daughters, without discounting in the least their credibility, is it not clear that to hang a real estate title on the slender thread of testimony given by two girls attempting to state an oral contract made in their hearing at a family council eleven years before when they were children, would be to disregard the Statute of Frauds altogether? For however sincere they may have been, as a practical matter we know it is very doubtful if they would be able to give the exact language or the exact meaning of what was said.

We do not overlook the fact that there was other evidence tending to corroborate them, but this evidence likewise is far from being clear and consistent. More than half of these witnesses stated the old man said the farm was George's at the time of the conversation; i. e., that by the contract made in 1914 the intestate gave the farm to George at that time—not that George was to get it at the intestate's death, as the petition pleads.

There is another phase of the matter that we consider of some importance. The witness Ad. Rader testified the old gentleman said to him that the home place was George's and that he was going to give the 120-acre farm to his daughter Madeline, the respondent. And the witness David Losey said the intestate declared he wanted George to have the home place as he was the only male heir and he wanted the home farm kept in the Waller name. Thus, by two of the appellant's own witnesses it was shown the intestate had in mind that the appellant should get the home farm as his share of the estate, and when this suit was brought the original petition so pleaded the contract; but thereafter a first amended petition was filed in which the appellant sought to obtain the home farm under the contract and to claim a half interest in the 120-acre farm as an heir. There is enough in the record to raise a question in our minds as to whether the real contract, if there was one in an ultimate, legal sense, was not as the appellant pleaded it in the first place.

Then again we have the testimony for respondent that the appellant stated he was to get the *use* of the home farm (not the fee title) for taking care of his father; and, after the father's death, that the estate was to be divided in two equal shares. In addition to this, the appellant admitted from the witness chair that he had offered to release the 120-acre farm to the respondent if she would release the 160-acre farm to him; and while he said this was by way of compromise, the respondent and her husband insisted the suggestion was offered as a means of effecting an equal division.

Taking all the testimony together we do not feel able to say the contract alleged has been proven beyond a reasonable doubt. Speaking of the high degree of proof exacted in cases of this character, it was said in Walker v. Bohannan, supra, 243 Mo. l. c. 140, 147 S. W. l. c. 1030:

"This standard should not be lowered. Real cases of specific performance of contracts of this kind have been few and far between, and justly so. Title to real estate should remain just where the death of the owner left it, unless the conduct of the owner has been such as to severely prick the conscience of the chancellor. When death has sealed the lips of the one who knows the facts, vague, loose and indefinite proven statements, or alleged statement, should not change the course of property descent."

II. The next assignment is that the trial court erred in setting aside the first report of commissioners in partition and in appointing new commissioners. It will be remembered the first set of commissioners awarded the 120 acres to the respondent and the 160-acre home farm to the appellant charged with the payment of $750 to the respondent to equalize the two distributive shares. One ground of the respondent's motion to set aside this report was that the commissioners had no

authority thus to disregard the respective rights and interests of the distributees in the *land* and to equalize an unequal division thereof by a cash adjustment. The court sustained the motion without hearing evidence.

The court's ruling was proper. The interlocutory decree found the interest of each party to be an undivided one-half and directed the commissioners to divide the land in kind and if this could not be done to report the fact to the court. The commissioners having disobeyed that injunction, the court set aside the report and appointed new commissioners under Section 2022, Revised Statutes 1919.

A sum thus assessed to equalize a partition is called owelty. Courts of equity have long exercised jurisdiction to award it (20 R. C. L. 736-739, secs. 18-21; 30 Cyc. 238, 261); but the power is used sparingly, and in a few states where statutory implication is deemed to be to the contrary it appears to be denied. [Hoerr v. Hoerr, 140 Minn. 223, 226, 165 N. W. 472, 167 N. W. 735; Wrenn v. Gibson, 90 Ky. 189, 13 S. W. 766.] There is no express warrant for the practice in our statutes, Article 11, Chapter 13, Revised Statutes 1919. Whether, and how far if at all, our chancery courts have such authority independent of the statute it is unnecessary to decide; for, the power being equitable must be exercised by the court and does not reside in commissioners. The appellant did not ask partition on that basis and the court did not order it. The commissioners' report could not stand alone. We put our ruling on that ground. [Ann. Cas. 1914-A, p. 650, note; Stortz v. Ruttiger, 249 Ill. 494, 499, 94 N. E. 181.] If the commissioners' report had been *confirmed,* it would be good at least against collateral attack, whether or not supported by an interlocutory decree ordering assessment of owelty (Sec. 2023, R. S. 1919); but here the report was set aside and the question arises on direct appeal.

III. Appellant assigns error in the trial court's refusal to reopen the case and admit certain testimony concerning the improvements he put on the 160 acres, and in the court's action in striking his second amended petition from the files. These are the facts. The case was tried, as heretofore stated, on the first amended petition. The sole issue tendered by appellant, as regards the 160-acre farm, was whether he was entitled to enforce the intestate's alleged oral contract. He sought partition only of the 120-acre farm. On March 17, 1925, the court made a finding and rendered a decree denying specific performance and ordering partition of the entire 280 acres in accordance with the prayer in the respondent's answer. The first set of commissioners was named in this decree and they filed their report on April 2. On April 4 the respondent filed her exceptions to the report; they were sustained, the report was set aside and new commissioners were

appointed. The second set of commissioners reported on April 21. The report was taken up for consideration by the court on June 6, confirmed, and an order of sale made.

Following this, on the same day, the appellant asked leave to re-open the case and introduce evidence showing the value of his improvements on the 160 acres was $3000, for the purpose of having them taken into account in the partition. In making this belated offer he stated he had not tendered the evidence sooner because at the time of the trial he was convinced the court would find a decree of specific performance as to the 160 acres. The request and offer were refused. Thereafter, in September, the appellant appeared again and moved the court to stay the order of sale on condition that he pay all costs in connection therewith, and that he be permitted to file a second amended petition itemizing the improvements and alleging their value to be $2905, for the purpose aforesaid. The motion was sustained, the sale postponed and the petition filed, the prayer thereof being that if specific performance be denied, the appellant should be allowed credit for his improvements in the partition. During the same month the court struck out this second amended petition on its own motion, the order of sale was renewed, the land sold to the respondent, and the sale confirmed.

The concrete questions presented are: (a) should appellant's requests have been granted at the stage of the trial when they were made, as a matter of procedural right; (b) or, if not that, was their refusal such an abuse of judicial discretion as to call for correction on appeal.

Appellant points to the well-established rule that the decree declaring the interests of the parties and ordering partition is interlocutory and subject to control of the court during the further progress of the cause until final judgment (Davidson v. Davidson Real Est. & Inv. Co., 249 Mo. 474, 493, 155 S. W. 1, 7); and he cites the case of Spitts v. Wells, 18 Mo. 468, which says the time to interpose a claim for improvements in partition is before the money arising from the partition sale is divided, or before the report of commissioners is confirmed if the partition is in kind.

Next, by way of analogy, attention is called to our "betterment" statutes, Sections 1834, et seq., Revised Statutes 1919, which allow the unsuccessful defendant in a possessory action for land, before his eviction, to institute a separate suit for compensation for improvements made by him in good faith (State ex rel. Jiner v. Foard, 251 Mo. 51, 56, 157 S. W. 619, 620), and to certain other cases holding that where a defendant in ejectment might have asked compensation for improvements by way of equitable counterclaim but did not do so, or where he did file such a counterclaim and the trial court failed to pass on it, in either case, he could institute a subsequent

separate action for the improvements. [Patillo v. Martin, 107 Mo. App. 653, 83 S. W. 1010; Williams v. Sands, 251 Mo. 147, 154, 167-8, 158 S. W. 47, 48, 52.]

Based on all this the argument is made that, since an occupying claimant may wait until *after final judgment* in ejectment to sue for his improvements, he ought, with all the more reason, to be permitted to come into a partition suit at any time before final judgment and do the same thing, there being no statute regulating the matter, the proceedings being interlocutory up to that point, and the court having direct jurisdiction to deal with such questions. In addition to these considerations, the appellant refers to the following cases where equitable relief was granted unasked even after the cause had reached this court on appeal.

Coberly v. Coberly, 189 Mo. 1, 87 S. W. 957: Suit in equity for partition in which the plaintiffs prayed an accounting for rents, for advancements made to the defendant J. L. C., and for general relief. The defendant J. L. C. by answer denied the plaintiffs had any title to the real estate involved and averred himself and another to be the owners by adverse possession. It was further alleged that the plaintiffs could not maintain the action because they were out of possession. On this latter ground the trial court denied partition and the plaintiffs appeal. This court ruled the evidence failed to show the possession of the defendant J. L. C. was so adverse as to amount to an ouster of his cotenants, and reversed and remanded the cause with directions to the court below to allow the defendant J. L. C. to amend his answer by making claim for improvements, to take an accounting of rents collected and improvements made by him, and to award partition.

Clay v. Mayer, 183 Mo. 150, 81 S. W. 1066: Plaintiff sued for specific performance of defendants' contract to convey land. Under the contract the plaintiffs were to discharge a mortgage thereon and to pay defendants $359.50, the balance of the purchase price. This latter they did, but instead of paying off the mortgage they bought it and foreclosed, the defendants bidding in the land at the foreclosure sale. All these facts were disclosed by the petition, which prayed that an account be taken charging the defendants with the rents, profits, etc., and crediting them with the amount paid on the mortgage, and that a decree be rendered vesting title in plaintiff upon payment of the balance found due.

The circuit court sustained a demurrer to the petition on the ground that it showed the contract as made had not been performed by the plaintiff. This court upheld that finding, but further ruled that since it was alleged the plaintiff had paid the defendants $359.50 in cash, as a matter of equity the judgment below sustaining the demurrer should be reversed and the cause remanded with directions

to the circuit court to try the case, and if it appeared from the proof that the plaintiff had in fact paid the $359.50, judgment should be entered for her in that amount with interest.

Bradshaw v. Yates, 67 Mo. 221: Suit in equity on ground of undue influence to set aside a deed executed by the plaintiff to her stepfather, who had been her guardian. The defendant denied the undue influence, and pleaded estoppel in that over a long period of time with her acquiescence he had made lasting and valuable improvements on the land, he being a cotenant and half owner. There was no prayer for an accounting for the improvements. The circuit court decided the case for the defendant. On appeal this court ruled the deed should be set aside, but held that to prevent a multiplicity of suits the cause should be reversed and remanded with directions to the circuit court to ascertain the value of the land without reference to the improvements and if the defendant would pay the plaintiff the value so ascertained the title should be vested in defendant.

Despite the persuasive arguments advanced by appellant we are not convinced that the trial court committed error. The refusal of the first application to reopen the case and introduce evidence on the value of the improvements was proper, if for no other reason, because it was made while the suit was still pending on the first amended petition, and there were no allegations in that petition concerning the value of the improvements as affecting the partition. When relief of that character is sought in a partition case it must be predicated by appropriate allegations in the pleading of him who seeks it. [30 Cyc. 219; Lilly v. Menke, 126 Mo. 190, 218, 28 S. W. 643, 651; Bates v. Hamilton, 144 Mo. 1, 13, 455 S. W. 641; Coberly v. Coberly, supra, 189 Mo. l. c. 19, 87 S. W. l. c. 961.] If the evidence had been admitted it would have been outside the scope of the pleadings.

The question is sharply raised, however, by appellant's second complaint—that the court struck out his second amended petition and refused to receive evidence in support thereof. But we do not think the record facts or the cases cited establish appellant's procedural right, as of course, to present the claim for improvements when he did. Two reports of commissioners had been filed and acted on before he sought credit therefor. He acquiesced in the first and now complains of its rejection. He took his chances on the second.

We construe the statement in Spitts v. Wells, supra, 18 Mo. l. c. 472, that the time to make claim for improvements in partition is before the division of the sale money, or before the confirmation of the commissioners' report—we construe that statement, we say—to mean that the times designated are the dead line, the last minute for the interposition of such a claim; and that, of course, is true because the order approving the sale and directing distribution of the proceeds, or the order confirming the commissioners' report of a division

in kind, as the case may be, is the *final judgment* in the cause. [Harbison v. Sanford, 90 Mo. 477, 481, 3 S. W. 20; Marsala v. Marsala, 288 Mo. 501, 504, 232 S. W. 1048.] The question under consideration in the Spitts-Wells case was whether a claim for improvements was *res judicata.* The matter of orderly procedure was not involved, and consideration thereof was not necessary to a decision of the cause.

Obviously, if an allowance for improvements is to be made in a partition suit it would be a part of the commissioners' duty to consider them in making a division in kind; and there may be times when the court would be required to take an accounting thereof before writing the interlocutory decree and declaring the interest of the parties. [30 Cyc. pp. 233-6, 257; 20 R. C. L. sec. 17, p. 735.] And as to a partition by sale, it is often true that commissioners must be appointed to divide the land in kind before it can be ascertained that the land must be sold. Aside from all this the convenience of the court and the saving of costs are to be reckoned. There is no reason why witnesses (many times the same ones) should be brought back for a second hearing, concerning improvements, at the option of the litigants. All things considered it is clear that orderly procedure requires the claim for improvements to be presented and heard before the decree for partition is entered.

Neither do we think there is sufficient analogy between proceedings in ejectment and partition suits to justify appellant's contention that he had the procedural right to present his claim for improvements any time before final judgment. Ordinarily in ejectment the right to possession is an issue that must be determined adversely to the defendant before the question as to compensation for improvements can arise, and that is doubtless the thought lying behind the provision in our betterment statutes that the suit for improvements shall be brought after judgment in ejectment. On the other hand, in partition suits the matter of accounting for improvements is part and parcel of the case, as we have indicated above (and we may add this is true even in ejectment actions where the duty to compensate for improvements is a condition precedent to a recovery of possession; Mann v. Doerr, 222 Mo. 1, 19, 121 S. W. 86, 92). And so it was held in Spitts v. Wells, supra, that a failure to ask compensation for improvements in a partition suit barred a subsequent action therefor. On this point the case has been cited with approval in Forder v. Davis, 38 Mo. 107, 116, and Bushman v. Bushman, 311 Mo. 551, 570, 279 S. W. 122, 128.

And so the proposition settles down to the question whether the rejection of the petition and proof was an abuse of judicial discretion though they were offered out of time. The rule is that these matters are largely confided to the trial court. [Newell v. Wagner Elec. Mfg. Co. (Mo. en Banc), 4 S. W. (2d) 1072, 1086; Willoughby

v. Brandes, 317 Mo. 544, 552, 297 S. W. 54, 57.] We think there was no reversible error in this case—if error at all. An issue about improvements was made in the specific performance branch of the case to some extent—enough at any rate to give the matter prominence. For a time, appellant was willing to let the partition be made without reference thereto. One of the respondent's defenses was that the appellant agreed to take care of the intestate and the home farm and keep up the improvements in return for the free use of the place during the intestate's life. If this is true he has been paid for the improvements or at least did not make them innocently. To permit him to reopen the matter would have been to allow him to relitigate the question, or certain phases of it. These considerations make the cases of Coberly v. Coberly, Clay v. Mayer, and Bradshaw v. Yates, supra, inapplicable as precedents here.

The judgment and decree below should be and they are affirmed. *Lindsay* and *Seddon, CC.,* concur.

PER CURIAM:—The foregoing opinion by ELLISON, C., is adopted as the opinion of the court. All of the judges concur, except *Frank, J.,* not sitting.