MELVIN SPORTSMAN and OLA SPORTSMAN, his wife, v. GEORGE HAL-STEAD, administrator of the estate of P. B. SMITH, CORA HINKLE, WILLIAM SMITH, MRS. ALENA ADAMS, JOHN SMITH, ANNA C. DAHARSH, MARGARET BRUNZ, HERMAN SMITH and SELMA SUTTON, heirs at law of the said P. B. SMITH, Appellants.—147 S. W. (2d) 447.

Division Two, February 1, 1941.

*Homer Rinehart* and *H. J. Griffin* for appellants.

*J. N. Burroughs* for respondents.

ELLISON, J.—This is a suit in equity to enforce specific performance of an alleged oral contract between the respondents, who are. husband and wife, and P. B. Smith, deceased, whereby the latter agreed that respondents should have and receive whatever property he might leave at his death, if they would live with him, take care of him, and administer to his physical wants and needs in sickness and in health so long as he might live. The contract is thus pleaded in respondents' petition. Smith was an aged bachelor and the defendants below, appellants here, are his administrator and heirs.

Respondents' petition alleged the personal property left by. the deceased was of the actual value of about $2500. It further charged 160 acres of described land in Howell County belonged to the estate, of which 22.5 acres stood in the name of the appellant John Smith as trustee for deceased. The answer of all the appellants was a general denial and a plea of the Statute of Frauds, Section 2967, Revised Statutes 1929, Mo. Stat. Ann., p. 1835. The appellant John Smith by his separate answer further affirmatively alleged he held title to the 22.5 acres, not as trustee for the deceased P. B. Smith, but in fee simple; and he invoked the ten year Statute of Limitations, Section 850, Revised Statutes 1929, Mo. Stat. Ann., p. 1121.

The decree below was for respondents. It divested title to the whole 160 acres out of appellants and vested it in respondents; but nevertheless failed to adjudicate the issue whether the appellant John Smith held the 22.5 acres (included in the 160 acres) as trustee for the deceased or as owner in fee simple, although considerable evidence had been introduced on that issue. This would seem inconsistent. But the decree explains that the chancellor had concluded he erred in refusing respondents' request during the course of the trial to withdraw the part of their petition raising the trust issue. That issue turned on the effect to be given a certain deed and its attendant trans-

actions; and concerned only the respondents and the single appellant John Smith, who insisted it was a separate and distinct cause of action. A demurrer to the petition and motions to require respondents to elect had been interposed on that theory. So the intended effect of the decree seems to have been to vest the 160 acres in respondents on other muniments of title, subject to John Smith's unadjudged claims through the deed mentioned.

The basic assignment of error on this appeal is that the evidence did not measure up to the exacting standards raised by the law in suits to enforce oral contracts for the sale of land despite the Statute of Frauds. Other assignments complain because the trial court: (1) permitted respondents to prosecute their suit under a petition charging two separate and distinct causes of action; (2) overruled appellants' demurrer to the petition and appellant John Smith's motions to require respondents to elect on which cause of action they would proceed and stand; (3) failed to adjudicate the separate trust issue originally raised against the appellant John Smith. There is another assignment that error was committed in admitting incompetent evidence. This dealt with the deed on which the trust issue was based.

The contract was made late in December, 1936, or early in January, 1937. P. B. Smith died ten months later in October. This suit was brought within two months, in January, 1938, and tried in October, 1938. These facts show the statements made by the deceased, as detailed by the witnesses, were not ancient but fairly recent—within 22 months or less—and with respondents' claims brought to the attention of the neighborhood by the prompt filing of this suit. P. B. Smith was single, old, feeble and a periodical drunkard. All of his heirs were collateral, and all nonresidents it appears. He had some heart trouble, and was unable to control his bowels and urinary organs. Toward the last he was bedfast. The nature of his infirmities made the personal attentions necessarily rendered him very unpleasant. It appears without substantial controversy that respondents performed their contract—if there was a contract. We sketch the testimony of the witnesses on that question.

The respondent Melvin Sportsman is sometimes called "Bud" Sportsman in this record. He and his wife were neighbors of deceased when the alleged contract was made about January 1, 1937. The latter resided on the 22.5 acres above mentioned. Mrs. John Russell and her husband were living with him but were about to move to Texas. With his home arrangements thus broken up Mr. Smith stayed part of the time at respondents' house. Mrs. Russell testified that on Christmas Eve, 1936, a short time before she and her husband left, Mr. Smith and Bud Sportsman came to the house and Mr. Smith said "he was going to try and get Bud Sportsman to come over and live with him, and take care of him just like we had been doing." Answering

another question she declared, "he just said he was trying to get the Sportsmans to move over with him and take care of him." The day before the Russells departed he said "he was just about to make arrangements with Bud to come over and take possession of the place."

Mrs. Lula Wade occupied a room in respondents' home. She heard a conversation there between Mr. Smith and Mr. Sportsman in December, 1936. She said Smith "told them if they would go and live with him and care for him that when he died what he had would be theirs; he said he was getting old and was afraid to stay alone; he was getting too feeble to live alone, and he wanted them to live with him and he would give them what he had at his death." At times Mrs. Sportsman would express the fear that their children might worry him, but Smith would insist that he loved children and would not be bothered, and that they (the Sportsmans) would be more suitable to take care of him than anyone else he knew. On cross-examination Mrs. Wade quoted the deceased thus: "He said if they would move down there with him and take care of him as long as he lived, when he died what he had would be theirs."

Clarence Lee and Ed Suter went to P. B. Smith's home to get the furniture that the Russells had left. Lee testified Mr. and Mrs. Sportsman were having a conversation with P. B. Smith (whom the witness called "Pete") in the kitchen, as follows: "Pete told him if he would move in with him and take care of him as long as he lived he would let him have what was left when he died. . . . Bud said he would move in just as soon as he could get around to it." On cross-examination the witness again detailed the conversation as follows: "Pete asked Bud when he was going to move in and they went ahead and Pete told him if they would move in and take care of him until he died he would deed him all of what he had left."

Ed Suter, who was with the witness Lee on the occasion just mentioned, said: "I heard Pete tell Sportsman if he would move in and take care of him he could have a home there as long as Pete lived, and when Pete died he could have what Pete had; and Sportsman told him he would move in right away, within the next day or two." On cross-examination the questions and the witness' answers on this point were as follows: "Q. The conversation you say you heard, you say Mr. Smith said if they moved in there they could have a home as long as he lived? A. That's what he said, yes, sir. Q. And when he died he would give them the rest of it? A. Yes, sir, and when he died he could have what was left."

Clarence Surrette operated a blacksmith shop for the WPA close to Mr. Smith's home. Smith came in about April, 1937, after the respondents had moved over to his home. Said the witness: "He was talking about Bud and his wife—about how good they were to him; and he said if they remained on as good as they had been he aimed for them to have what he had—something to that effect."

Smith made similar statements two or three different times. The cross-examination on the point was as follows: "Q. And he said they were good to him, and if they remained as good as they had (been) he expected them to have what he had when he died—is that it? A. Yes, sir. I believe that's what he said."

Sylvester Rhoads talked to, Mr. Smith at his home a month or six weeks before his death. Concerning this conversation the record shows the following: "He told me he had fixed it so Sportsman would have everything he had at his death provided they had took care of him like they had so far." "Q. What, if anything, did he say about having agreed with them that they should have everything he had? A. Yes, sir, that's what he said." (Objection sustained to question as leading.) On cross-examination: "Q. And in the conversation you had, about six weeks before he died, he said they been taking care of him, and he had fixed it so if they took care of him like they had been taking care of him, they would get what he had when he died? A. That's what I understood him to say. Q. He said if they took care of him like they had been taking care of him they would get what he had when he died? A. Yes, sir."

The witness Ernest Mead talked to Mr. Smith about the 10th of January, 1937, and thus recounted the conversation: "I said to him, 'I see you have Buddy and them with you now.' He said 'Yes, I had to have somebody live with me, my health is not very good any more; they are good to me, and I got them to come and stay with me.' He went on—I never asked him any questions, and he told me he aimed to let Bud have what he had at his death. He said 'I haven't got much but I agreed to let him have it for taking care of me.'" On cross-examination: "He just made this remark, 'If he takes care of me as long as I live I aim for him to have what I have got when I die.' Q. Let me get that straight, he said, 'If he takes care of me as long as I live I aim to give it to him?' A. He said 'We made this agreement, if he takes care of me as long as I live I aim for him to have what I have got at my death.' Q. You said a while ago that he said he aimed to give it to him? A. I didn't know that I was making that statement."

John Newton operated a filling station. He knew Mr. Smith but was not acquainted with the Sportsmans. He had been trying to trade Smith some land he owned for land that Smith owned. One day the latter part of Smith's life he stopped at the filling station and the witness brought up the trading proposition again, quoting Smith on the stand as follows: "He said he wasn't interested right now in trading; he had had Sportsmans to move in with him, and he had agreed to give Sportsman all his property if he would stay and take care of him as long as he lived, and he wouldn't care to trade it off on that account."

There is a further line of testimony about who paid the living expenses during the time the contract was supposed to be in force. One witness Thomas Dobbs said he plowed the garden at the Smith home and Mr. Smith paid half the bill and Sportsman the other half, 75 cents each. Curt Benn operated a grocery store in West Plains. Mr. Smith had made purchases there for four or five months prior to December 12, 1936, the bill for November and December amounting to $27.85. But he never bought anything after that date—in other words, after the contract with respondents had been made.

C. B. Zirkel also conducted a grocery store at West Plains. The respondents traded with him in the year 1937. Zirkel filed the bill for the last two months prior to Mr. Smith's death in the Probate Court against his estate. The bills usually ran about $15 twice a month, and Sportsman paid them the 15th and first of each month, whenever the WPA or PWA paid him. Mr. Smith had arranged with the witness to give Sportsman credit on two weeks time, Smith to stand good for the bills. All of them were made out against Smith but Sportsman paid all except the one filed in the Probate Court. That bill was never presented to Sportsman because the witness had not had a chance to see him. But the Sportsmans never came in and offered to pay the bill.

For the appellants, George Halstead, administrator of the P. B. Smith estate, testified that on the day of his appointment he went to the Smith home. He was accompanied by the appellant John Smith and the husband of one of the female heirs, as we understand. Mrs. Sportsman was there. He asked her how much the deceased owed them and she said, nothing. Later the witness went to the farm with the three appraisers of the estate. Mrs. Sportsman was asked what household goods belonged to P. B. Smith and what belonged to her and her husband, and she pointed out some belonging to each of them. One of the appraisers inquired what arrangement she and her husband had with Mr. Smith and how much Smith owed them. She answered that he didn't owe them anything. They were living there and getting their rent free and keeping Mr. Smith. She did not make any claim to the witness that she and her husband owned the farm or any of the personal property.

Once after that the witness was at the farm and Mr. Sportsman said he and Smith had bought some tires for a Ford car each to pay half. The administrator traded some personal property to Sportsman for his interest in the tires. Later Sportsman tried to buy the Ford car from the administrator. At no time did he claim he and his wife owned the farm under any contract with the deceased. They said they would move out as soon as they could get another place. Mrs. Sportsman brought him a bill claiming $444 pay for board and washing and care of the deceased from January 24, 1937 to October 30,

1937. The administrator was generally corroborated concerning his conversation with Mrs. Sportsman by the three appraisers.

In rebuttal the respondent Bud Sportsman admitted having a conversation with the administrator about the tires and buying the car but said that at that time he had not had the advice of any attorney regarding the contract with the deceased Smith; and denied that he told the administrator Mr. Smith owed him nothing. Mrs. Sportsman also denied having the conversation with the administrator and appraisers as they had recounted it. She said the question asked her was whether they were paying rent, and that she answered saying they were not, that it wasn't in their contract. She insisted she was never asked what she and her husband owned, and whether the deceased Smith owed them anything. Neither did she agree that they would move off the place. She presented the bill for services to the administrator because she had been informed the contract with Mr. Smith was unenforceable, being oral. She and her husband had not at that time obtained legal advice about their rights. The administrator being recalled admitted that at one time Bud Sportsman told him the deceased Smith had said he was going to take care of him.

The evidence definitely shows the respondents had *some* contract with the deceased, and that they performed their part of it. The big question of fact is what they were to receive for their services. Has that part of the agreement been proven as definitely and by such preponderance of the evidence as the law requires? Appellants' real position on the facts is that respondents were to get only the use of the farm where the deceased lived, rent free, for living with him and taking care of him. As to the law, they lean heavily on Walker v. Bohannon, 243 Mo. 119, 147 S. W. 1024; and respondents on Smith v. Lore, 325 Mo. 282, 29 S. W. (2d) 91. It so happens that the writer hereof prepared the brief advocating the view adopted by this court in the Bohannon case, and also the opinion in the Lore case, which reached a contrary conclusion. But they were based on different facts. The Bohannon case (243 Mo. 1. c. 136, 147 S. W. 1. c. 1028) sets out eight canons governing suits of this class, which, summarized, require that: (1) the oral contract must be clear, explicit and definite; (2) must be proven as pleaded; (3) cannot be established by conversations too ancient, loose or casual; (4) must be fair and conscionable; (5) the proof must be such as to leave no reasonable doubt in the mind of the chancellor; (6) performance must be referable solely to the contract sought to be enforced and not reasonably referable to some other; (7) the contract must be based upon an adequate, legal consideration; (8) a mere testamentary disposition or inclination to reward for services by way of gift, will not be sufficient. These

canons have been quoted or generally approved in numerous cases.[*]

We have already observed that the conversations showing the contract were not too ancient. We propose now to consider: (a) whether the contract pleaded was clear, definite and established by the requisite weight of evidence, or was shown only by conflicting, loose and casual conversations indicating a mere testamentary disposition on the part of P. B. Smith or a desire to reward respondents by way of gift; (b) whether it was fair and conscionable and based on an adequate, legal consideration; (c) whether the performance rendered by respondents was referable to that contract or reasonably referable to some other contract.

■ The contract pleaded was that respondents should have and receive whatever property the deceased might leave at his death, if they would live with him, take care of him and administer to his physical wants and needs in sickness and in health so long as he should live. Without any doubt these pleaded requirements as to what the respondents should do were clear and definite. The obligation on his part expressed in the contract, that respondents should have and receive whatever property he might leave at his death, also is sufficiently clear. As said in the Lore case, supra, 325 Mo. l. c. 291 (I), 29 S. W. (2d) l. c. 95 (1), "to be definite it does not always follow that a contract must be detailed." The clause meant, as it says, that the respondents should receive whatever property the deceased might leave at his death, not some specific property and not the property he owned when the contract was made (unless, of course, he owned it when he died). [Walker v. Bohannon, supra, 243 Mo. l. c. 138-9, 147 S. W. l. c. 1029-30.]

■ Now as to the proof of the contract, first with regard to the services to be rendered by respondents. (Italics and parenthesis hereafter are ours.) Mrs. Wade quoted deceased as making the requirement in a conversation with respondent Melvin Sportsman that if "they" would go and live with him and care for him that when he died," etc. On cross-examination she put it: "if they would move down there with him and take care of him as long as he lived." Clarence Lee, in narrating a conversation between deceased and both respondents, used substantially the same language except once he said, "if he (meaning Melvin Sportsman) would move in with him and take care of him as long as he lived." On cross-examination he used

[*]Merrill v. Thompson, 252 Mo. 714, 730, 161 S. W. 674, 678; Hersman v. Hersman, 253 Mo. 175, 186, 161 S. W. 800, 804; Hafner v. Miller, 299 Mo. 214, 230, 252 S. W. 722, 726; Snuffer v. Freeman (Mo. Div. 2), 274 S. W. 37, 41; Fishback v. Prock, 311 Mo. 494, 504, 279 S. W. 38, 41; Hoehn v. Hoehn (Mo. Div. I), 297 S. W. 954, 959; Waller v. George, 322 Mo. 573, 585, 16 S. W. (2d) 63, 68; Collier v. Porter, 322 Mo. 697, 714, 16 S. W. (2d) 49, 56; Smith v. Lore, supra, 325 Mo. l. c. 291, 29 S. W. (2d) l. c. 95; Selle v. Selle, 337 Mo. 1234, 1240, 88 S. W. (2d) 877, 881; Shaw v. Hamilton, 346 Mo. 366, 141 S. W. (2d) 817, 822.

the word "they" (meaning both respondents). Ed Suter in reporting the same conversation also used the word "he" on direct examination and "they" on cross-examination. Clarence Surrette introduced a slightly variant element by quoting the deceased as saying to him, "if they remained on *as good as they had been*," etc. Sylvester Rhoads stated that on another occasion the deceased in talking to him said if "they took care of him *like they had so far*." Ernest Mead put it once, referring to what Melvin Sportsman should do: "for taking care of me;" and on cross-examination, "if he takes care of me as long as I live." Witness John Newton used practically the latter expression in telling of still another talk.

It will be seen some of the witnesses used the word "he," some the word "they," and some used them interchangeably. Some did not expressly state the Sportsmans were to live with deceased in his home as long as he lived. But do these variations make any substantial difference? Would the testimony not have been less credible if the witnesses had agreed word for word? The thought runs through all of it that respondents were to care for deceased as long as he lived, and in view of the rural setting and the nature of the services to be performed, it obviously was in contemplation that they should be rendered in the home and in part by a woman. The only possible discordant element is introduced by the testimony of witness Surrette that deceased said: "if they remained on *as good as they* had been." But witness Rhoads phrased it, "*like* they had so far." A reasonable standard of performance must have been intended, and we take the deceased's expressions reported by these two witnesses as indicating his satisfaction with respondents' conduct.

Considering next respondents' proof of the part of the oral contract stipulating what they were to receive for their services. Mrs. Wade quoted the deceased: "when he died what he had would be *theirs*;" and again, "he would give them what he had at his death." Clarence Lee: "he would let *him* (Melvin Sportsman) have what was left when he died;" and on cross-examination, "he would *deed* him all of what he had left." Ed Suter: "*He* could have a home there as long as Pete (deceased) lived, and when Pete died he could have what Pete had;" but on cross-examination, "*they* could have a home as long as he lived, . . . and when he died he could have what was left." Clarence Surrette: "he aimed for them to have what he had;" and on cross-examination, "he expected them to have what he had when he died." Sylvester Rhoads: "he had fixed it so Sportsman (Melvin) would have everything he had at his death;" on cross-examination, "he had fixed it so . . . *they* would get what he had when he died." Ernest Mead: "he aimed to let Bud (Melvin Sportsman) have what he had at his death;" on cross-examination, "I aim for him to have what I have got when I die," or, "at my death." John Newton: "he had agreed to give (Melvin) Sportsman all his prop-

erty . . . and he wouldn't care to trade it off on that account.''

The plain meaning of the testimony of every one of these witnesses, except one, is that the property bound by the contract was what the deceased might have when he died. The one exception is John Newton, who said the deceased told him he had agreed to give Melvin Sportsman ''all his property'' and wouldn't trade any of it for that reason. That indicates a view on the part of the deceased that the land he owned when the contract was made was covered by it. If he had traded on even terms his estate would not have been diminished. But it may have been the expression of a mere moral obligation in the mind of the deceased, or an excuse for not entering into trade negotiations. Whatever it means, Newton's testimony on this point is greatly outweighed by that of the other witnesses.

Another thing. The verb expressing the idea of transference of title used by the several witnesses was not always the same. Twice the word ''give'' was used; once, the expression ''would be theirs;'' once the verb ''deed;'' once, ''get.'' But most of the witnesses used the word ''have'' with an appropriate auxiliary verb or phrase. An abundant weight of testimony supports the pleaded contract on this point.

The one serious question is, who was to get the property. Here again we find some witnesses using the pronouns ''he'' or ''him,'' referring to Melvin Sportsman; others, ''they'' or ''them,'' referring to both respondents; and still others using the singular and plural interchangeably, as did appellants' counsel on cross-examination. But in no instance during the trial was any witness asked to distinguish between these pronouns and to say what he meant. And when it is considered that no such question is raised by appellants in their brief; that it makes no difference to appellants whether one or both respondents receive the property; that respondent Melvin Sportsman was head of the family; and that the contract obviously contemplated Mrs. Sportsman would have to do much, if not more, of the work; we are satisfied all the parties had in mind that both respondents were beneficiaries under the contract.

In arriving at the several foregoing conclusions, which altogether amount to a finding that the testimony was sufficient to support the contract pleaded, have we gone too far, and violated the first and second canons laid down in the Bohannon case, that the oral contract shown must be clear, explicit and definite; and established by evidence of conversations not too loose or casual? We think not. Ver Standig v. St. Louis Union Trust Co., 344 Mo. 880, 884-5, 129 S. W. (2d) 905, 907, and many other cases point out that the Statute of Frauds was enacted to prevent frauds and perjuries; and the right of equitable intervention was grafted on the statute as an exception to prevent it from furthering fraud and perjury. But care must be taken to see that abuse of the exception does not open the door to

fraud and thereby thwart the statute. In other words, neither should be permitted to become an instrument of oppression.

Therefore, as the Ver Standig case says, "We cannot overlook the fact that we are dealing with an oral contract and the inherent infirmities attendant upon its establishment. The law of each case must arise from the facts of that case." To require technical accuracy of expression on the part of lay witnesses with little knowledge of the law of real estate, conveyancing and contracts, would make impossible the establishment of such oral contracts by the untutored. The witnesses may speak their own language if, with its background and context, their thought and meaning are clear and the contract is adequately and definitely proven on the whole record.

We think also the weight of the evidence was sufficient. The testimony for respondents was strong and came from witnesses apparently disinterested, at least strangers in blood. The contradictory evidence for appellants was that of the administrator and appraisers, who testified to admissions against interest made by respondents, particularly Mrs. Sportsman. These were to the general effect that the deceased owed them nothing, and that they had cared for him for the use of his home and farm. But the trial chancellor passed on the credibility of the conflicting testimony and we defer to his conclusion. [Smith v. Holdoway Const. Co., 344 Mo. 862, 875(2), 129 S. W. (2d) 894, 901.] Furthermore there is good reason for thinking the deceased might have wanted, or at least been willing, to make the kind of contract alleged. The evidence is undisputed that he was aged, infirm, lonely, living in a rural community, and dependent on strangers in blood for board, washing, care and attention. The Russells were leaving him. He importuned the respondents to move in. There is nothing in the record indicating any affectionate relation or social intercourse between him and his collateral heirs, all of whom were nonresidents according to the verified allegations of the petition, with no evidence to the contrary.

What has just been said answers most of the other questions in the case. We have already ruled that the evidence definitely shows respondents had *some* contract with the deceased and performed their part of it. And since, as we have further ruled, they established that the contract pledged to them the property deceased might have at his death, and disproved the only other possible contract suggested, viz., that they were to receive merely the *use* of deceased's home property during the rest of his life—since these things are true, we say, it necessarily follows that respondents' performance was referable solely to the contract pleaded and proven, because there was no other. And it further follows that the deceased's statements in his conversations were not mere expressions of a testamentary disposition or inclination to reward for services by way of gift, because if that were so

there would have been no contract at all. The evidence is abundant that deceased regarded the arrangement as contractual.

The only inquiries left are whether the contract pleaded and proven was fair, conscionable and based on an adequate, legal consideration; and whether respondents have no adequate remedy at law. In the second preceding paragraph we have pointed to reasons why deceased might have wanted, or at least been willing, to make the kind of contract pleaded and proven because of his age, infirmity, rural environment, dependence on strangers in blood, and the lack of any dependents and affectionate relations with or obligations to his collateral kin  In this latter respect the situation differs greatly from that in the Walker-Bohannon case, supra.

In the above connection the amount of property in the estate of deceased should be considered—especially since respondents put a value of $444 on their services by filing a demand against the P. B. Smith estate for that sum, after being told their oral contract was unenforceable and before they had received the advice of counsel. The inventory and appraisement of the estate in the Probate Court showed one Ford car and "junk," valued at $13.75; promissory notes valued at $2386; and cash in bank, $40.43; aggregating $2440.18. One of these listed notes on E. L. Mahan was secured by trust deed and valued at $300. In addition to the above, eight other notes for specified amounts aggregating $1305 were listed but reported "as questionable as to any value," and for that reason not chargeable against the administrator. One of these, on Thomas Belcher, was carried at $400. No real estate was listed in the inventory, as required by Section 58, Revised Statutes 1929, Mo. Stat. Ann., p. 36. As a matter of fact the deceased had none with the title standing in his own name at or before his death, during the times here involved, though respondents' petition in this case claimed he owned the equitable title to the 22.5 acres, standing in the name of his brother John Smith as trustee.

The way the real estate came into the case was that the Thomas Belcher note for $400 was secured by a deed of trust covering an 80 acre tract described as the SE ¼ of the SE ¼ of Sec. 14, and the NE ¼ of the NE ¼ of Sec. 23, both in Township 23, Range 10, Howell County, Missouri, recorded in book 160, page 233. The administrator filed a petition in the Probate Court to compromise that note by accepting Belcher's warranty deed to the 80 acres because he was insolvent and a foreclosure sale under the deed of trust would not bring the amount due. No order was made granting the petition but nevertheless Belcher made a warranty deed to the appellant heirs on February 18, 1938, for one dollar and other valuable considerations, after the original institution of this suit, which deed is recorded in book 228, p. 514. The deed was expressed to be *subject* to said deed of trust, and also contains a recital that Herman Smith and Selma

Sutton, two of the appellants, own an undivided one-seventh interest in the land, jointly.

The E. L. Mahan note for $300 was one of several secured by a deed of trust covering an 80 acre tract described as the S ½ of the NE ¼ of Section 25, Township 24, Range 9, Howell County, Missouri, dated January 16, 1925, and recorded in book 188, page 34. One of the secured notes for $100 matured in a year on January 16, 1926. On that anniversary lacking one day, that is to say, on January 15, 1926, E. L. Mahan and wife by warranty deed recorded in book 192, page 146, conveyed to deceased's brother, the appellant John Smith (according to the face of the record) the 22.5 acre tract heretofore mentioned, described as Lot two of E. L. Mahan's Subdivision of the SW ¼ of the NE ¼, said Section, Township and Range. Nevertheless the deceased continued to live on it until his death. This lot was in the west half of the above 80 acres, and the description purports to cut an irregular tract from the northwest part thereof in the shape of a quadrant but with the arc meandering instead of curved. A plat of said subdivision was filed on the date of the warranty deed, January 15, 1926, and apparently on the same day the above mentioned deed of trust was released as to said lot. On January 10, 1938, four days before the filing of this suit, the sheriff sold the whole 80 acres to the appellant heirs at foreclosure sale under the deed of trust, his deed being recorded in book 205, page 130. They paid nothing for it. Appropriate allegations were inserted in an amended petition to bring the foregoing facts into the case, and establish that the appellants held the land subject to respondents' contract. At the time of trial a separate suit was pending to cancel the sheriff's deed, brought by Mahan against appellants.

So, glancing back over the last two paragraphs, it appears the facts about the 160 acres described in the petition and decree stand this way. The 80 acre tract deed by Belcher to appellants is worth less than the $400 for which it was encumbered, and an undivided ¼ interest therein belongs to two of the appellants, Herman Smith and Selma Sutton, jointly. And no part of the title to the other 80 acres, obtained through the sheriff's foreclosure of the Mahan deed of trust, is clear: first, because Mahan has a suit pending to cancel the sheriff's deed; second, because that deed did not pass title to the 22.5 acres included in the 80 acres, since it had been released from the deed of trust before the foreclosure; third, because on the face of the record the 22.5 acre was deeded by Mahan to appellant John Smith in fee simple contemporaneously (it seems) with the release of that land from the deed of trust; fourth, because John Smith claimed in this suit to be the outright owner of the 22.5 acres and the chancellor belatedly washed his hands of that part of the controversy in the decree, in conformity with respondents' prior request and appellants' contention that it was a separate cause of action.

In this state of the record we are unable to say what land belongs to the P. B. Smith estate—which we would have to do in order to put a value on it, though it is evidently small. As to the personalty, the administrator in testifying as a witness for respondents said the cash assets in his hands at the time of trial amounted to about $1183.85. But there is no showing as to the debts and administration expenses that will have to be paid out of this, or as to the possibility of realizing on other assets.

We feel unable to decree authoritatively, in view of these facts and others, whether the contract was fair and conscionable and the respondents have no adequate remedy at law—in other words, whether they are entitled to specific performance. We are further impelled to that conclusion by the absence of important facts. All this we say though conceding the respondents have proven by the requisite weight of evidence that the oral contract entitled them to whatever property P. B. Smith left at his death, and that there are reasons for thinking he might have wanted or been willing to make such a contract. Parties who have ignored the Statute of Frauds cannot exact the pound of flesh although their oral contract awards it to them. Specific performance will be granted only where the very justice of the thing calls for it. This phase of the doctrine applying to suits of the present character is ably discussed in Selle v. Selle, supra, 337 Mo. l. c. 1239-1244, 88 S. W. (2d) l. c. 880-884.

Here we have exceedingly murky proof as to the value of the estate. Respondents valued their services at only $444 in their probate demand. The deceased lived only ten months after it was made, and there is no evidence as to his exact age so that his life expectancy at the time of the execution of the contract can be ascertained. This we say on the theory that even though P. B. Smith lived only a comparatively short time, still respondents would have been bound by the contract to care for him if he had lived much longer, and they ought not to be deprived of the value of their bargain at the date of the agreement, especially since it gave deceased tranquil assurance for the future like an insurance annuity. The services rendered by respondents were arduous and disagreeable, within the meaning of the Selle case (337 Mo. l. c. 1242, 88 S. W. (2d) l. c. 882) and appellants did not raise the issue of the adequacy of the consideration. For these reasons we feel respondents ought not to be foreclosed here on that issue. The Selle case extricated the parties from a difficult situation by denying specific performance and remanding the cause with directions to ascertain the reasonable value of the claimant's services and to fasten a lien on the land therefor.

In this case we must reverse the decree if for no other reason than because we find no basis in the record for vesting the title to the whole S ½ of the NE ¼ of Section 25, Township 24, Range 9 in respondents, thereby including the 22.5 acres, Lot 2, E. L. Mahan's

Subdivision. This for the reasons stated in the fourth preceding paragraph. Further, the Belcher warranty deed to appellants (book 228, page 514) conveying the other 80 acres, in Section 23, apparently passes title only to an undivided six-sevenths of that land for reasons stated in the same paragraph, the other one-seventh being in the appellants Herman Smith and Selma Sutton. We find no reversible error in the chancellor's refusal to determine the separate issue as to whether appellant John Smith owned the 22.5 acres as trustee for P. B. Smith or in fee simple, as recited in the third paragraph of the decree. This was in harmony with appellants' theory of the case, not against it.

Accordingly this court finds, adjudges and decrees that on or about January 1, 1937, the deceased P. B. Smith entered into an oral contract with the respondents Melvin Sportsman and Ora Sportsman that if they would move onto the place where the deceased then lived, live with him and take care of him and administer to his physical wants and needs in sickness and in health so long as he might live, they should have and receive whatever property he might have left at his death, meaning such real and personal property as otherwise would have remained for distribution to his heirs, he having died intestate, after the payment of debts and expenses of administration. The court further finds that respondents fully performed said contract.

But otherwise the findings and decree below are reversed and the cause remanded with directions to the trial court to ascertain the nature, amount and value of the estate of deceased as above defined; and to determine and decree from the facts so found whether respondents are entitled to specific performance of said contract; or to a money judgment for the amount found due, secured by a lien on the property of the estate; or to other relief. This being an equity case, and appellants and respondents both having obtained relief by this appeal. It is ordered that the cost be taxed equally against them. All concur: