# CHRISTIAN SCHEERER v. FELIX SCHEERER, Appellant.

### Division Two, March 23, 1921.

1. **PURCHASE OF LAND:** Oral Contract: Specific Performance. The Statute of Frauds is an insuperable barrier to the enforcement of an oral contract for the purchase of land, unless the proof of such contract is so clear, cogent and convincing as to leave no reasonable doubt in the mind of the chancellor as to its terms and conditions; and where part performance is relied upon to take the case out from under the operation of the statute, there must be like proof that the acts performed refer to the contract and would not have been done unless on account of and in pursuance to it and with a direct view to its performance.

2. ————: ————: Part Performance: Possession. Taking and continuing in possession by the vendee under an oral contract for the purchase of land, with the vendor's consent, the payment of a substantial part or all of the purchase price, and the making of substantial improvements, are acts of performance when referable solely and unequivocally to the contract. The taking of possession alone is not generally recognized as sufficient part performance, but taking possession, followed by the further act of part payment, or the making of improvements, is sufficient to validate the parol contract.

3. ————: ————: ————: Signing Deed. Where the vendee made substantial part payment, went into possession, made valuable improvements, and afterwards made other substantial part payments, all referable solely to the parol contract of purchase, and a receipt for a large payment was given with the vendor's name attached thereto, and his testimony as to whether he signed the receipt is evasive, and he signed a deed in exact harmony with and in pursuance to the parol agreement, which he refused to deliver and accept a deed of trust for the balance, the evidence showing that a desire to avoid taxes being controlling, the contract will be specifically enforced, there being no other rational hypothesis on which the signing of the deed can be explained.

4. ————: ————: Indefinite Terms: Cured by Interpretation. An objection that the parol contract pleaded is indefinite as to the payments to be made by the vendee before the vendor would

Scheerer v. Scheerer.

make a deed, is cured by an allegation and proof that on the making of certain payments the vendor agreed to make a deed, which he did sign but did not deliver, for this was an interpretation of the contract which made it definite.

5. ———: ———: **Time of Payment: Interest as Compensation for Delay.** Where the time of payment of the purchase price of land was optional with the vendee, as it suited his convenience, the law implies a reasonable time; and where the vendor accepted a second payment five years after the sale, time was not of the essence of the contract. And ordinarily, where the time of payment of the purchase is optional with the vendee, the payment of interest on the deferred payments will be sufficient compensation for the delay.

6. ———: ———: **Homestead: Wife's Consent.** Where the land the vendor orally agreed to sell was his homestead, enforcement will not be denied on the ground that he could not sell it without the concurrence of his wife, where he sold it with the intention of abandoning it, acquired another homestead which he still occupies, accepted payments on the purchase price years after the sale, and permitted the vendee to remain in possession, exercising acts of ownership, for fifteen years.

7. ———: ———: **Specific Performance: Wife's Inchoate Dower.** The wife not being a party to the parol contract for the sale of land or to the suit to specifically enforce, although it is clear that it was mutually understood that the vendee was to have a deed executed by both the vendor and his wife, and the vendee being entitled to a decree of specific performance, the purchase price should be diminished by the value of the wife's inchoate dower, unless she will join the vendor in the execution of a deed.

Appeal from Moniteau Circuit Court.—*Hon. J. G. Slate,* Judge.

REVERSED AND REMANDED (*with directions*). ..

*Embry & Embry, S. C. Gill* and *Roy D. Williams* for appellant.

(1) When a verbal agreement has been properly part performed, say by the purchaser, equity recognizes in him exactly the same primary right which would have existed, if the contract had been written. The right to

have the very thing done, which was agreed to be done. If this primary right or duty is violated by vendor's refusal to perform, equity gives to the vendee its remedy of specific performance. Pomeroy's Equity (2 Ed.), sec. 103; Pomeroy's Equity (2 Ed.), sec. 1409. (2) Equity will not permit the respondent in this case to withdraw from the contract he entered into with appellant. It would be a great injury to appellant to permit respondent so to do. Appellant had paid a portion of the purchase price, had been placed in possession under contract of sale, and had made valuable and permanent improvements. Equity aids in compelling specific performance under circumstances of this nature. Berg v. Moreau, 199 Mo. 416. (3) Where one in pursuance of and on the faith of an oral agreement and promise of the owner that he shall have a deed for the land, enters into possession and makes valuable improvements, the case is taken out of the Statute of Frauds, and specific performance should be decreed. Anderson v. Shockley, 82 Mo. 250; Dougherty v. Harsel, 91 Mo. 161; Hubbard v. Slavens, 218 Mo. 620; Lambert v. Railroad, 212 Mo. 693. (4) In the case at bar, the contract is shown by a great preponderance of the evidence. In fact, a deed was executed by the vendor under the verbal contract. Vendor simply refused to deliver the deed. He received from time to time interest on all unpaid purchase money, and received four different payments on the purchase price. He has refused to make a deed pursuant to his verbal agreement. He has retained the $1400 paid on the principal purchase price, in addition to the interest. He has not offered to return this sum. He simply proposes to keep all that has been paid to him, and also to keep the land that he had agreed to convey. Appellant, pleads and proves that he is ready, willing and able to meet all sums due on the purchase price and has been thus ready at all times. The decree of the court should have been in favor of the appellant, and upon the payment into court of the unpaid purchase price title should have been decreed in appellant.

*John M. Williams* and *George H. Williams* for respondent.

(1) The defendant failed to establish the allegations of his cross-bill. (2) The evidence discloses a contract between father and son altogether different from that alleged in the answer. (3) The defendant broke the contract made with his father and was not entitled to equitable consideration even though he had relied in his answer on the contract he actually made. The default of the son was willful. (4) The contract really made could ripen the possession of the son into a title upon two conditions: (a) compliance by the son and (b) the death of the parents. Breach of the contract by the son would leave him without remedy in equity; and a court of equity could not accelerate the death of the parents. (5) The agreement as alleged in the cross-bill was to be executed "when the defendant was ready to make some additional payments on the land." Such an agreement is not enforceable because of indefiniteness. Such contracts must be "clear, definite and unequivocal." Goodin v. Goodin, 172 Mo. 48; Huff v. Shepard, 58 Mo. 242; Hilliard on Vendors, 153; 4 Kent (10 Ed.), 534. (6) The cross-bill shows the defendant broke the contract he alleges he made, and the testimony proves he broke the contract actually made. In such case ejectment is the proper remedy. Gibbs v. Sullens, 48 Mo. 237; Goodin v. Goodin, 172 Mo. 43. (7) Even if the allegations of the cross-bill relating to the contract and the proof in support were as definite as that required in Grantham v. Gossett, 182 Mo. 671, or in Goodin v. Goodin, 172 Mo. 48, or in Dalzell v. Dueber Mfg. Co., 149 U. S. 315, yet the relation of the parties is such as to keep the case within the Statute of Frauds. Emmel v. Hayes, 102 Mo. 195; Rosenwald v. Middlebrook, 188 Mo. 93. And, in such relationship, the payment of a part of the consideration, or improvements made by the son on the father's land, or possession when accompained by improvements, will not be treated

as part performance. Pomeroy on Specific Performance (2 Ed.) secs. 112, 127, 115; Eckert v. Eckert, 3 P. & W. (Pa.) 332.

HIGBEE, P. J.—Christian Scheerer is the father of the defendant. November 7, 1918, plaintiff brought this action of ejectment for the recovery of a farm in Moniteau County, containing about 100 acres, laying the ouster on August 8, 1918. The first count of defendant's answer is a general denial. The second count avers that plaintiff was the owner of the land, and that on August—, 1903, defendant purchased it from plaintiff at the price of $5500, and, on or about August 20, paid $500 thereon; that plaintiff put defendant in possession and agreed that when defendant was ready to make some additional payment on the land plaintiff would execute a deed to defendant for the farm; that he also paid on the purchase price, February 1, 1910, $500; June 1, 1910, $200; July 25, 1912, $200; and that he paid all interest during the years stated; that defendant made improvements thereon of the value of more than $600; that shortly after the purchase of said land plaintiff made a deed therefor to defendant, but when requested to deliver it refused to do so, or to deliver it to a bank in escrow; that defendant was ready, able and willing to make full payment when he requested the delivery of the deed; that in the year 1912 plaintiff informed defendant he would never make him a deed for said premises and has never done so; that on or about August 20, 1912, there was due plaintiff $4100 for the purchase price of said land, which, with the interest, and taxes on said land paid by plaintiff since the year 1912, amounts to $6000, which sum he offers to pay into court for the benefit of plaintiff. Wherefore he prays the contract be specifically performed.

The reply is a general denial, and further avers that the alleged contract was not to be performed within a year, was not reduced to writing, and was void under the Statute of Frauds.

The case was tried May 7, 1919, and judgment rendered for the plaintiff, assessing his damages at $500 and the monthly rents and profits at $40, and dismissing defendant's cross-bill. Motion for new trial being overruled, defendant appealed.

Plaintiff bought the farm in 1899 and lived on it with his wife and son, the defendant, a bachelor of mature years. The defendant had been working on the farm and was to receive one-third of the income. It seems that plaintiff kept all the income, and in the summer of 1903 the son concluded to leave the farm and talked about buying a restaurant in Tipton.

Gallaher, a witness for plaintiff, testified he heard a conversation between the plaintiff and defendant early in August, 1903. Plaintiff said his son should take the farm at $5500, giving plaintiff $275 per year, and Felix would have it when plaintiff and his wife died; that would be five per cent on $5500 for the rental value of the land. Felix seemed satisfied. That was a fair price for the land. The rental value now is $7 per acre. This talk was in Tipton, in Steinkraus's shoe shop. Six months after this plaintiff went to Tipton. His son was not married; he married in January, 1905. None of this $5500 was to be paid, nothing but the rent during the intervening period. Nothing said about making a deed.

Felix Scheerer testified: "I lived on the farm with father and mother about five years; have been in possession alone about fifteen years. Father was to give me one-third of what we made on the farm, but he had never settled with me from the time we moved there until this August, 1903, and I asked for a settlement and told him I wanted to work for myself. He figured up and wrote me a check for $900, but that included my mare, wagon, farm tools and cow at what I paid for them, $400, and he aimed to keep them when he gave me this check. After he settled with me he went out of the house, and my mother said she didn't want me to leave, but to stay and run the farm; they were getting old and would have to rent or sell it. I said I would not rent the place,

287 Mo.—7

but I will buy it if father will sell it on time. Mother said to go and see him. I went to the barn and asked him. He said he would sell me the farm at $5500 and charge me five per cent on the money. I said that was all right; I have $500 in this check, I will give it back and consider $500 paid on the place and keep my stock and pay you $250 interest a year, and he said that was all right. He said I won't make you no deed until you have more money to pay off on it. Next thing he said was, I will pay the taxes if you will furnish me my wood, and I said I would do that, haul it to town, and I did that up until and including 1912. He has paid the taxes. Father moved to town. The next payment I made on the land was February 1, 1910, $500. (Witness here produced a receipt which he said he had carried in his pocket book). I wrote it and father signed it at his house in Tipton. It reads: 'Tipton, Feby. 1, 1910. Received of Felix Scheerer one thousand dollars payment on tract of land of ninety-two acres of land. (Signed) Christ. Scheerer.' I told father he had given me nothing to show for that first $500. He said just make this receipt for $1000, this $500 and the $500 I paid him when I bought the place. I paid this $500 with check for $375 and $125 in cash. (Witness produced check). I gave this check to my father. The check is marked paid. I paid father $200 middle of June, 1910, in cash. He said if people knew he had money he would have to pay taxes on it. The next payment on the purchase price was July 25, 1912, $200. The total payment on the purchase price was $1400. I paid the interest, $250 in 1904, $250 the next year. From 1903 on down to 1912 I paid five per cent interest on the unpaid purchase price each year. I put up one and three-fourths miles of hog wire fence, built a closet and two hen houses, a shed and garden fence; cost a little better than $600. I also covered the house, replastered two rooms, painted house and barn and other buildings. When I paid father the second $500 and he had me write the receipt; he said he would have a deed made, and ten days or two weeks

later when I was there he brought me the deed. I read it .over; it described the land, but mother hadn't signed it. He said I will keep this deed here; in case something happens to me your mother can still sign this deed and hand it over to you. About October 1, 1913, I was going to make another payment of $100 and the interest, and I told him I wanted him to make me the deed so I would have something to show how we stood. He said, 'Didn't I give you a receipt for $1000?' I said I have paid $400 since that. He said he never would make the deed; I said I would pay no more money till he made me a deed. I had Mr. Embry, my attorney, draw up a contract and see him, but he never signed it. This contract, dated July, 1914, recites the sale of the farm to Felix Scheerer in August, 1903, for $5500; that $1400 has been. paid on the principal sum and all interest to date; that a warranty deed to said land in favor of Felix Scheerer has been placed in the Farmers' Bank at Tipton, which deed shall be attached to this contract and held as long as Christ. Scheerer shall live and then delivered to Felix Scheerer. Interest at five per cent shall be paid on unpaid purchase price, and any sum remaining unpaid at my death shall be paid to my executor or administrator. Including last year, the way I figured it, there was about $6000 due on the premises. I offer to pay that into court. I am able and willing to pay it."

Cross-Examination: "I didn't want to stay on the farm as a renter. Father paid the taxes since 1913. Father had insurance on the buildings. I paid the insurance up to 1913. I had it insured three years ago. In the fall of 1904, I borrowed $300 of father to buy 14 acres. I paid that back in January, 1905. I also borrowed $300 from him to buy some cattle. I paid that back in 1905. I also borrowed $65, and at another time $40. He said he kept a book account of it. There was no running account between us. I paid all that back. In October, 1913, I was going to make this additional payment of $100 and the interest. I then owed father $4100 on the land. I offered to give him a deed of trust. I built

the shed and barn after October, 1913. The place was worth $135 an acre in 1913. The reason I paid the $200 in money was because father didn't want to pay taxes on it. In April, 1913, my sister paid father $2500 that he had loaned her. I stopped paying father because he wouldn't make me any papers to show I was paying him.''

Redirect: ''Father said if he took a deed of trust he would have to pay taxes on it.''

William Smith testified: ''I have known Mr. Scheerer since we were boys; always have been friends. In 1904 or 1905 he told me he had sold this place to Felix for $5500, and he says: I ain't going to make him no papers; if I do—I am going to pay the taxes on the land; if I take a deed of trust I would have to pay taxes on that and he would have to pay taxes on the land and it would be double taxes and, he says, he has got a contract.''

William Vogelbecker testified: ''I know Christian Scheerer. He said he sold the place to Felix for $5500, and he wasn't going to make him a deed because he didn't have to pay no taxes on the money you know. That was in 1915 or 1916.''

Alva White testified: ''I saw Christian Scheerer in Steinkraus's shop in Tipton about August, 1914, I had a contract about the trade between Scheerer and his son. I got it from Felix. Christian Scheerer talked about it. The main reason why he wouldn't sign it was because Felix didn't marry to suit him. He said if Felix thought that woman would get this place—and he said that was his life-long labors and he didn't want her to have it. He didn't particularly object to Felix getting it. He said he had sold the place to Felix, and made the deed, and had the deed at home, and would in time give it to him, but he wanted to control it as long as he lived—the deed; he wanted to keep it in his possession.''

Christian Scheerer testified: ''I am seventy-six. I have three children. Felix there *was*. He is forty-six, and Pauline and Mamie. I bought the farm in 1899. I had an arrangement with Felix in 1903. The last of July,

1903, he left me.  He sold his cow and went to Oklahoma on Thursday; came back Sunday.  He bummed in town near four days and wanted me to settle up; he wanted to buy a restaurant.  So I told him, if I sell it to keep him away from town.  I promised him the land after my death for $5500.  He would pay me $250 the year.  I rented him the place.  I moved out in the spring.  He wanted $300 to buy thirty acres of land off Snorgrass, and I told him to go to my son-in-law, Keisling, get the money, and I will pay him back.  He afterward borrowed $350 to buy cattle.  He didn't pay me $500 on the land. I made the settlement.  He kept the stock.  I didn't give him a check for $900, not as I know.  He paid me off every year.  I kept books.  I charged him with what I gave him.  He never pay me since '11, always a year back.  The last payment, he paid me for '12, or '11, I mean.  In '13 he didn't pay nothing.  There is where he demanded a deed from me.  I told him as long as me and my wife been living I never would sign the deed to anybody.  Mr. Embry says that he deposit the deed in bank.  I said I would do that after my death, but not before.  He paid me $500 in 1910, that was in '09

"Q.  Did you sign this (Showing receipt for $1000)? A.  Not as I remember, because he never had $1000 to pay me.  I never got $1000.  I did not owe him $500 in 1903.  I owe him nothing.  He kept his stock, the wagon and stuff.  He wanted to buy a restaurant.  He made these payments of $200 in 1910.  That would be $900 on account of what he owe, and Mr. Embry made that contract.  I was willing to do that if he come up and settle with me.  He owed me more than this.  He broke his contract since by not paying the rent since 1912. I bought a house in town.  My wife and I live in that. I have paid all the taxes and the insurance.  I think in them last three years once in a while he paid some.''

Cross Examination: ''I don't know in my head exact-what he owed me any more.  I had made a deed convey-ing the land to Felix.  You (Embry) wanted me and my wife to go down with you and make the papers.

I say, 'No, we can make the papers up here.' You say my wife didn't sign it; it wasn't no account. I never had $1000 and I never gave a receipt for $1000.

"Q. Did you sign it? A. I never got the $1000, I tell you. I never sign it. If them $1000 would be here that's different. That is not my signature. That check $375 may be all right. I never took it on the land. He owe me in the beginning $650. He had money from me six or seven years and every year I count off with him to how we stand. In June, 1910, I got some money from him. Payment on the land? nothing.

"Q. Hasn't he paid you $1400 on the purchase price of the land? A. He hasn't paid me five cents at the present time. He owe me $600 or $700. He paid nothing on the land.

"Q. In 1912 didn't Felix offer to give you a deed of trust for $4100? A. Yes. He asked me, but I didn't. Taxes had nothing to do with it. Why I promised that he should have the land. I paid $400 to my son-in-law Keisling. He got it from him and I paid it back to Keisling, and then he borrow 14 acres of land.

"Q. Did he make you some payments on the land? A. Well, I don't know if a man call it payments, or if I call it a running account.

"Q. How much of the $5500 has he paid? A. Nothing."

Redirect: "I had a running account with Felix in my book." (Here the witness again enumerated the items above mentioned and a few other small charges that he said appeared on his book, a copy of which, in English, he produced). Plaintiff's counsel, referring to the receipt, asked him:

"Q. *Did you sign it? A. Well, I ain't sure; I can't swear to it.*"

Felix Scheerer testified: "I don't understand them figures that father has copied from his book. I paid the first and second $500 and then two $200 payments on the place, and told him so. Father signed the receipt. It is now just as it was, with the exception of being folded and worn.'

I.   The plaintiff relies upon the Statute of Frauds as a defense to the defendant's plea for specific performance.   There can be no question that the statute is an insuperable barrier to the enforcement of specific performance of an oral contract for the sale of land, unless the proof of such contract is so clear, cogent and convincing as to leave no reasonable doubt in the mind of the chancellor as to its terms and conditions; and where part performance is relied on to take the case out of the operation of the statute there must be like proof that the acts performed refer to that contract and would not have been done unless on account of and pursuant to that very agreement and with a direct view to its performance. [Collins v. Harrell, 219 Mo. 279, l. c. 301; 36 Cyc. 647.]

*Parol Contract.*

Within a decade after the enactment of the statute in England, it was found that its literal enforcement would result in frauds and hardships more widespread than those which it was designed to suppress.   It was realized that in many instances the statute itself was made an instrument of fraud.

At an early day the rule of part performance, under the limitations above stated, was adopted in England and in most of the jurisdictions of this country.   It has long been the rule in Missouri.   The taking of and continuance in possession by a vendee under a parol contract made by a vendor, with his consent, the payment of a substantial part or all of the purchase price, and the making of valuable improvements are acts of part performance, when referable solely and unequivocally to the parol contract. There must be a radical change in the attitude of the parties towards each other, a change consisting of acts done that of themselves indicate that some contract has been made between the parties.   Parol evidence is then admissible to show the details of the agreement.   [Shacklett v. Cummins, 270 Mo. 496, l. c. 499.]   Indeed, the rule in England is that taking possession is of itself sufficient part performance, but that rule has not been

*Part Performance.*

generally recognized in this country. The rule here is that taking possession, followed by the further act of part payment, or the making of improvements, as an act of part performance, is required to validate the contract. [36 Cyc. 654.] Do the facts in this case meet these requirements?

II. It is altogether natural that the defendant should have concluded, after five years of unrequited labor on his father's farm, to insist on a settlement and take up some other line of endeavor. He was thirty years of age, unmarried, and had accumulated but a few hundred dollars' worth of personal property. Note the plaintiff's evidence: *"I made the settlement. He kept the stock."*

Facts Showing Performance.

That his son was to quit the honorable and independent life of a farmer and engage in running a restaurant in a little country village evidently grieved the plaintiff, but he appears to have been unable to undertake a reconciliation. It was the mother who, in this crisis, intervened with the hope of inducing her son to remain on the farm, and thus avoid an estrangement. She suggested that he see his father and buy the farm. It was then the father said: *"I told him if I sell it to keep him away from town."* He admits that his son paid him $500 February 1, 1910, $200 in June, 1910, and $200 in 1912. He admits he signed a deed and, no doubt, but for his obsession about eluding the payment of taxes, the sale and conveyance would have been happily closed by his taking back a deed of trust for the unpaid purchase money. His quibbling and evasive denials of signing the receipt for the $1000 paid on the farm discredit his testimony. "If them $1000 would be here, that's different." When pressed by his own attorney, "Did you sign the receipt?" the answer was, "I ain't sure; I can't swear to it."

III. When we consider the testimony of Smith, White and Vogelbecker, in connection with all the other

facts and circumstances in the case, there can be no reasonable doubt that plaintiff verbally contracted to sell the farm on the terms sworn to by his son. The execution of the deed can be explained on no other rational hypothesis. Nor can there be any reasonable doubt that he signed the recei1 acknowledging payment of $1000 on the farm. This receipt, although an incomplete memorandum, is unequivocal evidence of an antecedent contract of sale, and that the payment was made solely with reference to that contract. He told Smith, White and Vogelbecker his real reasons for not delivering the deed; he didn't like his daughter-in-law; she should never have the land; it was his life savings; if he took a deed of trust he would have to pay taxes on it and Felix would be taxed on the land. Taxes were his nightmare. Shylock-like he would hold fast to the deed until Death released his grasp; then the mother could sign and deliver it to Felix. There was no suggestion, when talking with his old neighbors, that he did not sell the farm, or that Felix had not made satisfactory payments. These poor, frivolous, unreasonable pretexts were the only excuses he could offer for not keeping faith with his son. They demonstrate the barrenness of his defense. They are a confession of the justice of his son's claim. *Expressio unius.*

The statements to Smith, White and Vogelbecker cover a period of eleven years, from 1904 to 1915. During all that time his statements and actions were inconsistent with his testimony at the trial. He surrendered possession of the farm to his son in April, 1904, and acquired another homestead. His son has ever since retained exclusive possession of the farm and made valuable improvements. He made payments thereon to his father which were satisfactory, else the father would not have signed the deed. That he made the improvements and also made the payments on the land solely with reference to and in execution of the contract of purchase, clearly appears, not only from the testimony

of the defendant, but by the terms of the receipt and the fact of the execution of the deed. That the payments were made on other indebtedness, if there were any, is inconsistent with his statements to the witnesses (not questioned by plaintiff), the receipt and the deed, which he admits he signed and told Embry he would deliver after, but not before, his death. These radical changes point unerringly to the antecedent contract of sale clearly established by the evidence. To deny specific performance under the evidence would make the statute an instrument of fraud.

IV. It was objected at the trial and in respondent's brief that the contract pleaded is indefinite as to the payments to be made by the defendant before plaintiff would make a deed, but the answer also avers that on the making of certain other payments, the plaintiff agreed to and did make a deed. This was plaintiff's interpretation of the contract. The averments referred to are sufficient; at least after judgment.

*Indefinite Terms: Interpretation by Deed.*

V. There was no time fixed for the payment of the purchase money. That was optional with the son, as it suited his convenience. Where no time is fixed, ordinarily the law implies a reasonable time. The plaintiff accepted a second payment on the purchase price nearly five years after the contract of sale. Clearly, time was not of the essence of the contract. In contracts of sale between strangers, failure to pay at the time stipulated will not usually work a forfeiture or authorize a rescission. It will ordinarily be inferred that interest on the defaulted payment will be sufficient compensation for the delay, compensation and not forfeiture being a favorite maxim with courts of equity. [39 Cyc. 1368; Scannell v. Am. Soda Fountain Co., 161 Mo. 606, l. c. 621.]

*Time of Payment.*

The defendant, in his answer and on trial, offered to pay the residue of the purchase price, with all inter-

est, into court. That is all that is required in an action for specific performance of a contract of this character.

VI. The contention that plaintiff could not sell his homestead without the concurrence of his wife is not Homestead. pleaded. He made the contract for the sale of his farm with the intention of abandoning it as a homestead. He bought and removed to his residence property in Tipton which he still occupies as his homestead. He cannot have two homesteads at the same time. [Stanley v. Baker, 75 Mo. 60, l. c. 62.] After acquiring a new homestead he accepted payments on the purchase price of his farm and allowed defendant to continue in possession, exercising acts of ownership, for fifteen years, and so ratified the contract.

VII. Another question, not mentioned in the briefs, must be considered. The wife of the plaintiff is not a party to the action nor to the contract of sale. That it Wife not was mutually understood that the defendant a Party. should have a deed executed by his father and mother cannot be doubted. Being clearly of the opinion that the defendant is entitled to a decree of specific performance, how shall the decree be framed in the event plaintiff and his wife do not join in executing a deed of conveyance to the defendant? In that event the purchase price should be diminished by the value of the wife's inchoate dower.

In Tebeau v. Ridge, 261 Mo. 547, l. c. 571, Court in Banc, in an opinion by Judge FARIS, said:

"If then such contracts are to be enforced—and the rule is that while the enforcement thereof is in the discretion of the chancellor, the discretion to be used is a sound judicial, and not a capricious, discretion, and also the rule is that other things being equal they are to be enforced—then in my opinion both the weight of authority and the reason of the thing lie with the view that there should be a diminution of the purchase price by the present value of the wife's inchoate dower. The defaulting optiongiver should not get the whole pur-

chase price and then as a reward for his breach of contract keep one-third of the title in a life-estate in the family.''

See foot of page 574 for the basis of reckoning the value of the wife's inchoate dower. [See, also, 39 Cyc. 1582.]

The judgment is reversed and the cause remanded, with directions to the trial court to ascertain the remainder due to plaintiff from the defendant on the purchase price of the land described in the petition, with interest at the rate of five per cent per annum from July 25, 1912, and taxes, if any, paid by plaintiff since the year 1912, with six per cent interest thereon, and, upon payment into court of these sums by defendant within a reasonable time, to be fixed by the court, to order specific performance and that the sums so found due be paid to plaintiff, if plaintiff and his wife will execute a deed conveying the premises in controversy to defendant, or, if within a reasonable time, to be fixed by the court, the plaintiff and his wife do not execute a good and sufficient deed conveying said lands to defendant, the court shall enter a decree divesting all the right, title and interest of the plaintiff in said premises and vesting the same in defendant in fee upon the payment into court by defendant for the plaintiff of the said sum so found due and taxes as aforesaid (if any) diminished by the value as of the time of the trial (May 7, 1919) of the inchoate dower of plaintiff's wife in the one-third part of said premises, calculated at six per cent upon the basis of a life in the contingent dowress in excess of the plaintiff's expectancy, if any, according to the American experience table (Sec. 5968, R. S. 1879), all costs to follow the decree. All concur.