SOUTHERN REAL ESTATE & FINANCE COMPANY, a Corporation, and DELMAR INVESTMENT COMPANY, a Corporation, Appellants, v. PARK DRUG COMPANY, a Corporation.—126 S. W. (2d) 1169.

Division One, April 1, 1939.

*Boyle & Priest, George T. Priest* and *Robt. E. Moloney* for appellants.

398

*Ralph Kalish* and *Nagel, Kirby, Orrick & Shepley* for respondent.

BRADLEY, C.—This is an action to recover $20,864.36 as damages for the breach of an alleged agreement to lease certain property. The prayer of the petition was for $36,000, but this amount, plaintiff conceded should be reduced by rentals received on the property in the alleged lease period, and other matters not necessary to mention. A jury trial was waived. The court found for defendant and plaintiffs appealed.

Plaintiffs own the Central National Bank Building at the northwest corner of Seventh and Olive Streets, St. Louis, and claim that defendant agreed to lease, for five years, the ground floor premises known as 705½ Olive Street, and breached the agreement. J. H. Farish-Knapp Company, real estate agents, St. Louis, represented plaintiffs, and Alfred J. Guth was an employee of this company. Edward Glik, a real estate agent, St. Louis, represented defendant. Guth was manager of the building and had an office therein. Prior to April 16, 1932, Glik called on Guth to ascertain if defendant could obtain a room in the building for a drug store. Guth told Glik that the storeroom known as 705½ Olive might be available. The premises were then occupied by the Cuquet Jewelry & Optical Company and had been for eleven years. The lease of the jewelry company had expired, and this company had been a month to month tenant since February, 1932. Guth told Glik that the rental would be $7200 per year, and for Glik to take the matter up with defendant, and have defendant submit a proposal in writing, and that he, Guth, would then submit the matter to plaintiffs, the owners. Defendant, on April 16, 1932, submitted the following:

"In regard to storeroom 705 Olive Street being same storeroom now occupied by the Cuquet Jewelry & Optical Company, make the following proposal:

"To lease said storeroom for a period of ten years at $7,200.00 per·

annum for the purpose of selling at retail, drugs, patent medicines, cigars, tobacco, cigarettes, package candies, toilet articles and to conduct this store in the same manner as the other two stores operated in St. Louis by us, those stores being located at 711 Washington Avenue and 2720 N. 14th St.''

Guth submitted defendant's offer to plaintiffs, and it was refused, because plaintiffs thought that if they leased to defendant with permission to sell tobaccos they might have to reduce the rent of the tenant who operated a cigar stand in the lobby of the building. Guth says that he then took up the matter with Glik, and that Glik suggested that he, Guth, ''draw up a lease for five years at seventy eight hundred dollars.'' Pursuant to this suggestion, and on April 18, 1932, Guth wrote Glik as follows:

''Dear Mr. Glik: We are enclosing herewith leases for 705½ Olive street, for the Park Drug Company, for their approval and execution.

''You will please note that the rental as mentioned in said lease is in the amount of $7800.00 per annum, we believe that your client will appreciate that in order to give them the privilege of selling tobacco, we are compelled to ask this increase, as we are quite sure we will be compelled to make our present cigar man in the building lobby a concession of this amount due to the diversion of this class of business to your client.

''This leases have been dated from June 1st, 1932, should we be unable to deliver possession on that date, it is understood that the rent shall commence on date of delivery of possession.

''Yours very truly,

''J. H. Farish-Knapp & Co., Agents.

''By:

''P. S. We have marked inside of leases with red ink to show proper place for signature and seal.

''A. J. G.''

The $7800 offer was rejected by defendant, but Guth and Glik continued their efforts to bring about results. Guth testified that Glik thought that if he, Guth, could get plaintiffs' consent to a $7200 a year lease results might be obtained. Guth told Glik to have defendant ''give us a letter,'' and that he would again submit the matter to plaintiffs. Guth testified that Glik ''brought in'' the following letter, bearing date of May 6, 1932, addressed to J. H. Farish-Knapp & Company, and signed, ''The Park Drug Co., I. T. Krohn, Pres.:''

''Gentlemen: In regard to storeroom at 705½ Olive Street being same storeroom now occupied by Cuquet Jewelry & Optical Company, make the following proposal:

''To lease said storeroom for a period of five years at $7,200.00 per annum for the purpose of selling at retail, drugs, patent medicines, cigars, tobacco, cigarettes, package candies, toilet articles and to conduct this store in the same manner as the other two stores operated

in St. Louis by us, those stores being located at 711 Washington Avenue, and 2720 N. 14th St.

"To have the exclusive right to sell drugs and patent medicines in the Central National Bank Building premises.

"To be allowed fifteen days free rent beginning with the first day of occupancy."

Guth and Glik discussed the subject as to when defendant could get possession. It is not clear just when such discussion or discussions took place, but we infer that it was (principally) on the occasion when Guth told Glik to have defendant "write us a letter," and shortly prior to defendant's letter of May 6th. On the subject of possession Guth testified:

"Q. Will you state exactly the conversation as near as you can, relative to that? A. Well, Mr. Glik asked me when we could get possession of it, and I told him I thought I could get possession by the first of July, with the possibility of securing possession by the 15th of June, and Mr. Glik says, 'That will be fine, because it will give the drug company fifteen days in which to get started, and they would like to get started in business before the first of July, if possible,' and I told him I would see Dr. Cuquet and see if I could get possession the 15th of June, and I told Mr. Glik at that time, 'If I cannot come to any agreement with Dr. Cuquet by the 15th of June it will require us to give him the thirty days notice to get possession the first of July,' but the result of the negotiation with Dr. Cuquet was that he promised us that he would get out on the 15th of June, which he did. Q. After you had had your conversation with Dr. Cuquet, in which he promised to get out by the 15th of June, did you inform Mr. Glik to that effect? A. Yes, sir; I think it was around, along—it was the 10th of May I wrote Mr. Glik a letter, and I addressed the letter to Park Drug Company, inclosing lease for the premises, and I mentioned in that letter that I would secure possession on the 15th of June."

May 10th Guth wrote I. T. Krohn, Cincinnati, Ohio, defendant's president, the letter (appearing presently) which, according to Guth, was mailed to Glik, and by him forwarded to defendant at Cincinnati, Ohio. Two lease forms were enclosed, but neither was signed by plaintiffs. The letter follows:

"Dear Sir: In connection with the lease *about to be entered into* between your company and the Central National Bank Building Company, it is understood that your rent shall commence fifteen days from the date that we deliver possession to you.

"We want to call your attention to the clause in the lease as to the time of delivery of possession, as these premises are now occupied and we are going to try and secure possession as soon as possible, we put this clause in the lease to protect either party in the event that any complications may arise in securing possession.

"We believe that we will secure possession, if not before, not later than June 15th, 1932.

"The leases should be executed at the bottom of the second page on lines marked with the letters 'XX.' " (Italics ours.)

Defendant did not reply to plaintiffs' letter of May 10th. Between May 10th and 20th, Guth says that he called Glik "every now and then," and "wanted to know what he had heard from Cincinnati," and that Glik said that he had not heard "anything as yet;" that about May 23rd, he called Glik, and that Glik told him that "Mr. Krohn changed his mind, and they were not going through with the contract."

Plaintiffs, appellants here, make six separate assignments, but all are to the effect that under the facts the court should have found for plaintiffs.

It is contended by plaintiffs that a contract for five years at $7200 per year was consummated, and defendant contends the contrary.

The trial court gave and refused declarations of law, and made a finding of facts. Among the findings was No. 11, as follows: "The lease forms, plaintiffs' exhibits C and D (enclosed in letter of May 10th) contain material additions to the terms expressed in defendant's said letter of May 6, 1932, and the submission thereof constituted a counter proposal by plaintiffs to defendant."

Defendant, in the brief, says that its letter of May 6th "did not constitute a written offer to enter into a lease," and that plaintiffs' letter of May 10th "did not constitute, nor was it intended as, an acceptance" of an offer. Defendant argues that both letters "were but preliminary steps looking towards a contractual relationship."

Illinois Fuel Co. v. Mobile & Ohio Ry. Co., 319 Mo. 899, 8 S. W. (2d) 834, was an action to recover for coal sold defendant. One of the questions involved was whether the contract was consummated in Illinois or Missouri. The railroad company's purchasing agent, from office in St. Louis, wrote (319 Mo. l. c. 915, 8 S. W. (2d) l. c. 839) the fuel company: ". . . I am attaching in duplicate contract covering a total of 50,000 net tons of 2000 pounds, to be delivered daily in approximately equal quantities, from July 1, 1920, to July 1, 1921, at $2.45 per net ton. Will you kindly have the contract properly executed on behalf of your company and return to me for final handling. I will return a copy to you properly executed."

The fuel company at Sparta, Illinois, replied: "We are herewith returning to you duplicate contract properly executed for final handling, at which time, we note, you will return copy to us for our files."

It was held that the contract was not consummated until signed by the railroad companies (two railroad companies signed the contract) in St. Louis, and a copy returned to the fuel company. In ruling the point the court said (319 Mo. l. c. 916, 8 S. W. (2d) l. c. 839): "Appellant cites cases in support of the general rule that, when a definite proposal addressed by one party to another is unconditionally accepted by the other, a contract is then and there completed, and the

place of acceptance is the place of contracting. [Allen v. Chouteau, 102 Mo. 309, l. c. 318, 14 S. W. 869; Horton v. Insurance Co., 151 Mo. 604, l. c. 619, 52 S. W. 356.] This rule contemplates a proposal made without any reservation, and with the intention that the contract shall be complete upon acceptance of the proposal. Such were the facts considered in the cases cited by appellant, but such are not the facts presented in this case. The agent for the railroads sent the mining company a form of contract *unsigned*, together with a letter requesting that it be signed by the mining company and returned to him *'for final handling.'* Evidently he never intended that the contract should be completed and become effective when signed and mailed to him by the mining company at Sparta, Ill., or he would have *signed* the contract in duplicate and mailed it, with the request that it be likewise signed by the mining company and a duplicate original be mailed back to him. At any rate, if he intended that 'the last act toward the completion of the contract' should be that of the mining company in mailing him the contract, after it had signed same, he should not and would not have said that it was to be returned to him *'for final handling.'* " (Italics in opinion.)

It will be observed that plaintiffs, in the present case, in their letter of May 10th, and with which *unsigned* duplicate lease forms were enclosed, referred to the lease as one *about to be entered into*. There was no claim in that letter or any other that the lease was *then* consummated. Also, it will be observed, according to the finding of facts, that the lease forms enclosed with plaintiffs' letter of May 10th, contained "material additions to the terms expressed" in defendant's letter of May 6th. Guth testified that the lease forms enclosed with the letter of May 10th were the same as those sent to Glik, defendant's agent, in the letter of April 18th, but Guth admitted that he and Glik did not, at any time, discuss the *terms* and *conditions* of the lease. All that was discussed was *duration* and *consideration*.

"In order to make a bargain it is necessary that the acceptor shall give in return for the offeror's promise exactly the consideration which the offeror requests. If an act is requested, that very act and no other must be given. If a promise is requested, that promise must be made absolutely and unqualifiedly. This does not mean necessarily that the precise words of the requested promise must be repeated, but by a positive and unqualified assent to the proposal the acceptor must in effect agree to make precisely the promise requested; and if any provision is added to which the offeror did not assent, the consequence is not merely that this provision is not binding and that no contract is formed, but that the offer is rejected.

"The new condition is as fatal when its inconsistency with the offer appears by implication only as when it is explicitly stated. Thus when an offer is made by mail to sell stock, a reply in terms accepting the offer, and adding 'ship with draft attached' adds a new condition

since by implication the place of delivery under the offer was the seller's residence, and the reply transfers it to the buyer's." [1 Williston on Contracts (Rev. Ed.), sec. 73.]

Section 58, Restatement of the Law of Contracts, says: "Acceptance (of an offer) must be unequivocal in order to create a contract," and comment a says: "An offeror is entitled to know in clear terms whether the offeree accepts his proposal. It is not enough that the words of a reply justify a probable inference of assent."

In State ex rel. Equitable Life Assur. Society v. Robertson et al. (Mo.), 191 S. W. 989, 1. c. 991, the law is stated thus: "It is elementary that in order to make a contract there must be, among other things, a meeting of the minds of the contracting parties regarding the same thing, at the same time. The negotiations or preliminary steps taken by the parties leading up to the making of a contract do not of themselves constitute the contract. The contract is not complete or consummated until the proposition of the one is presented to the other and by him accepted as presented without conditions or qualifications. In other words, the acceptance of the proposition presented by the one must be accepted by the other in the form tendered; and if the acceptance omits, adds to, or alters the terms of the proposition made, then neither party to the negotiations is bound. So long as any element of the proposition is left open, the contract is not complete and, of course, not binding on any one." Numerous cases are cited.

We cannot say, from this record, that there was no evidence to support the trial court's finding that the lease forms enclosed with plaintiffs' letter of May 10th contained "material additions" to defendant's offer of May 6th. Also, when plaintiffs sent the lease forms on May 10th, they did not sign them, and were not bound. And in addition, plaintiffs' letter of May 10th, by using the expression, "In connection with the lease about to be entered into," as above stated, indicates that plaintiffs did not consider that the contract would be consummated until signed by the parties.

The judgment should be affirmed and it is so ordered. *Ferguson* and *Hyde, CC.,* concur.

PER CURIAM:—The foregoing opinion by BRADLEY, C., is adopted as the opinion of the court. All the judges concur.