Olyn G. ELLISON and Margaret G. Ellison,
Plaintiffs-Appellants,

v.

WOOD GARMENT COMPANY, a corpora-
tion, Defendant-Respondent.

No. 7497.

Springfield Court of Appeals.

Missouri.

Jan. 13, 1956.

Chinn & White, Turner White, III, Walker Daniel, Clampett & Ritterhouse, B. H. Clampett, Springfield, for plaintiffs-appellants.

Schwab & Carr, Springfield, for defendant-respondent.

RUARK, Judge.

In this suit for specific performance plaintiffs have appealed from an adverse judgment rendered on motion at close of plaintiffs' case. The petition charged a parol agreement whereby plaintiffs leased to defendant "all of the masonry building (hereinafter referred to as 'the building') situate on" certain described lots in Reeds Spring, Missouri, for a term of ten years with option for an additional ten years and at a rental of $80 per month; that such lease was reduced to writing (and such was made a part of the petition), but that defendant refused to abide by its agreement and execute the lease. The answer pleaded denial and the statute of frauds.

Facts developed by plaintiffs' evidence were that plaintiff Olyn Ellison, his wife, Margaret, and her mother were the owners of a concrete block building in Reeds Spring. Ellison, who was a contractor, had erected this building some four years previously for the purpose and with a view of occupancy by a garment factory. After it was constructed it was leased to a group of business men in the town, who in turn subleased it to, or at least permitted occupancy by, one Tony Hagale, who there ran a garment factory. The lessee townsmen paid the rent to plaintiffs and also paid a portion of Hagale's electricity bill. This lease was due to expire on May 9, 1953. In February, previous to the events here involved, Hagale had "indicated" a desire to talk to Ellison about leasing the building himself and, presumably, continuing in his occupancy. But this was only an indication; the conversation never got as far as a negotiation or discussion of term or

terms, because Ellison put Hagale off and the conversation was not pursued further.

At this time the defendant corporation was operating a garment factory at Republic, Missouri, and a Mr. Abramson and Mr. Weinsaft were its managing officers. Near March 1, 1953, representatives of the defendant made several phone calls to plaintiffs' residence in Springfield. Abramson finally established contact with Ellison and asked him if he (Ellison) would be interested in leasing the Reeds Spring building for a term of twenty years. In a few days Ellison drove to defendant's office in Republic, where they discussed a long term lease generally. At that time Ellison told Abramson that his wife and her mother were interested as co-owners and he would seek their advice and concurrence. A week or ten days later he again went to Republic and talked with defendant's representatives. It is this, the second meeting, upon which plaintiffs rely for their contract. Pertinent portions of Ellison's testimony in chief are as follows:

"Q. What discussion, if any, did you have then concerning the lease? A. I informed them that I had talked it over with my wife and mother-in-law, and that we had decided that we would lease the building to them. And they instructed me to have my lawyers prepare the lease. At that time we discussed, generally, on who was to keep the building up and who was to pay the insurance, and relative to maintenance of the building."

The witness stated that the length of term (twenty years) and the rental ($85 per month) were agreed upon. As to other matters:

"Q. Did I understand you to say that you reached an agreement about insurance? A. Yes, sir.

"Q. And reached an agreement about upkeep? A. Yes, sir.

"Q. And about taxes? A. Yes, sir.

"Q. Were you instructed by Mr. Abramson or by Mr. Weinsaft to have a lease prepared by your attorney? A. I was, sir.

\*　　\*　　\*　　\*　　\*　　\*

"Q. Mr. Ellison, when you left Republic at the conclusion of this second visit, was it your belief, or understanding, that you had reached an agreement with the Wood Garment Company for lease of the building in Reeds Spring? A. Yes, sir."

Following this meeting Ellison went to his attorney and had a lease prepared which he said set out the things which had been agreed upon. He also had his attorney notify Hagale to get out of the building at the end of the lease soon to expire.

About April 1 Mr. and Mrs. Ellison took the typed lease (with carbon copy) to Republic and met with defendant's representatives. Abramson read this prepared lease and objected to two items only. He said he had changed his mind about a twenty-year term and wanted ten years with an option of ten more. He didn't want to pay the specified rental of $85 per month. Ellison agreed to Abramson's suggestions and made pen and ink alterations changing the term of years accordingly and fixing the rental at $80 per month. After this Abramson said "it looked just fine" to him, handed his pen to Mr. and Mrs. Ellison and requested them to sign it, which they did. Then Abramson said he wanted to have *his* lawyer read the lease, that it was "customary and businesslike." Ellison said he could understand that, because there were several pages of fine print, and that this would be agreeable. Abramson said as soon as his lawyer checked the lease he would sign it and mail the carbon copy to Ellison.

About a week later Abramson called the plaintiffs' home and talked with Mrs. Ellison. He stated that he understood Hagale had not left Reeds Spring. She asked him if that made any difference, and he said the town couldn't "take care of" two factories. In her words, "He said he was awfully sor-

ry about it, and he knew that he had caused us to evict our present tenant, and had promised to rent from us, and he knew that he had done us an injustice. And he said, 'I will rent the building from you for at least a year.' " Thereafter the plaintiffs made tender of possession, but defendant never accepted it and the lease was never signed.

According to plaintiffs, the question of whether Hagale would or would not leave Reeds Spring was never discussed during the negotiations above referred to. Actually he did not leave, but at or near the expiration of the lease to his townsmen-sponsors he simply moved his factory into another building across the street. There was evidence that it involved considerable expense to train garment workers and that defendant had been expecting to employ workers who had been trained by Hagale in event Hagale took his factory out of town; that it would have been impractical for two garment manufacturers to operate in such locality because of the shortage of skilled labor. Plaintiffs' witness Hagale testified that he had been satisfied with his previous location in plaintiffs' building and his relations with Ellison had been reasonably cordial; that he had mentioned to Ellison the possibility of his leasing the building, but no terms, conditions or rentals had been discussed. We can conclude from his testimony that had Ellison so chosen there was a possibility or perhaps even a probability that Hagale might have leased the building; but on what terms we cannot even speculate.

■ It is conceded that the contract sought to be enforced falls within the prohibition of the statute of frauds. Enforcement is sought upon the theory of "part performance." Courts of equity sometimes enforce parol contracts barred by the statute, but this is a chancery power, used only to prevent deep-seated wrongs, which is most sparingly exercised. Walker v. Bohannan, 243 Mo. 119, 147 S.W. 1024, 1028; Jones v. Linder, Mo.Sup., 247 S.W.2d 817, 825. "Parties who have ignored the stat-

ute of frauds cannot exact the pound of flesh although their oral contract awards it to them. Specific performance will be granted only where the very justice of the thing calls for it." Sportsman v. Halstead, 347 Mo. 286, 147 S.W.2d 447, 456. As Judge Lamm once put it, " * * * it is nonenforceable in equity, except on one high condition, and such condition arises when the nonenforcement of the contract would work an equitable fraud upon the promisee; that is, the conscience of the chancellor is stirred, and relief is extended in his open palm, when, and only when, it is certain beyond the peradventure of a doubt that to deny the relief would be to strike down the underlying purpose of the statute of frauds, to wit, the prevention of frauds and perjuries." Kirk v. Middlebrook, 201 Mo. 245, 100 S.W. 450, 462. Specific performance presupposes the existence of a complete and concluded contract. 81 C.J.S., Specific Performance, § 30, p. 476, and cases infra. And in this character of action, by which the petitioner appeals to the conscience of the chancellor to override the plain provisions of the statute, the contract so claimed must be proved by "clear, cogent and convincing" evidence. Thompson v. St. Louis Union Trust Co., 363 Mo. 667, 253 S.W.2d 116, 121; Scheerer v. Scheerer, 287 Mo. 92, 229 S.W. 192, 196; Collins v. Harrell, 219 Mo. 279, 118 S.W. 432, 437. Such evidence must be so clear and forcible as to leave no reasonable doubt in the mind of the chancellor as to the contract and its terms. Jennings v. Achuff, Mo.Sup., 272 S.W.2d 263, 265; Feste v. Bartlett, Mo.Sup., 269 S.W.2d 609, 613; Roberts v. Clevenger, Mo.Sup., 225 S.W.2d 728; Schebaum v. Mersman, Mo.Sup., 191 S.W.2d 671, 675; Mason v. Mason, Mo.Sup., 153 S.W.2d 27, 33. The contract sought to be enforced must be so final, definite, clear, precise and exact that its terms cannot be misunderstood. In short, a court of equity will not decree specific performance of a contract which is uncertain, incomplete or indefinite in terms or intendments. P. R. T. Investment Corp. v. Ranft, 363 Mo. 522, 252 S.W.2d 315, 319; Blake v. Shower, Mo.

App., 207 S.W.2d 775, 779; Walker v. Bohannan, 243 Mo. 119, 147 S.W. 1024, 1028, supra; Forrister v. Sullivan, 231 Mo. 345, 132 S.W. 722, 730.

We shall not lengthen this opinion by discussing or determining whether plaintiffs' case meets all of the canonical requirements necessary to exempt a contract from operation of the statute but will concern ourselves only with whether the plaintiffs have established a concluded contract by proof required in cases of this character; and, if so, was the contract pleaded and sought to be enforced the one which was actually proved? The plaintiffs rely upon the transactions of the second meeting. The only change of position which they claim on their part occurred shortly thereafter (and before the final meeting) when they notified Hagale to vacate.[1]

 In order to have a contract of the character here presented, there must be "a meeting of the minds" upon terms so definite that the promises and performances are reasonably certain and none are in doubt or subject to future ascertainment (unless the contract itself provides a method of ascertainment). Brown v. Childers, Mo.App., 254 S.W.2d 275; P. R. T. Investment Corp. v. Ranft, 363 Mo. 522, 252 S.W.2d 315, supra; Fernan v. Prudential Ins. Co. of America, Mo.App., 162 S.W.2d 281, 283, 284; Jesse v. Rolaff, Mo.App., 74 S.W.2d 890. It cannot be made of anticipatory or preliminary acts or negotiations. There must be a definite offer and a concluding acceptance, so that the parties have agreed to the same thing in the same sense at the same time. 101 A.L.R., Annotation, p. 965; Jones v. Linder, Mo.Sup., 247 S.W.2d 817, supra; Butler v. Missouri Ins. Co., Mo.App., 187 S.W.2d 56, 60; Dobbins v. City Bond & Mortgage Co., 343 Mo. 1001, 124 S.W.2d 1111, 1115. Proof of mere willingness or disposition or intent to do an act in the future does not itself make an *agreement* to perform the act. Jennings v. Achuff, Mo.Sup., 272 S.W. 2d 263, 266, supra; Hinkle v. Hinkle, Mo. Sup., 236 S.W. 30, 34; Walker v. Bohannan, 243 Mo. 119, 147 S.W. 1024, supra; Forrister v. Sullivan, 231 Mo. 345, 132 S.W. 722, supra; Collins v. Harrell, 219 Mo. 279, 118 S.W. 432, supra; see Southern Real Estate & Finance Co. v. Park Drug Co., 344 Mo. 397, 126 S.W.2d 1169.

 The parties were negotiating for and looking forward to a lease; whether they had actually settled on what all the terms would be we will discuss later in this opinion. Was it their mutual purpose to bind themselves at that time and by that conversation, or was it their expectation to be bound by the contemplated instrument to be formally executed as the concluded contract? Such is usually a question of intention. Shapleigh Inv. Co. v. Miller, Mo.App., 193 S.W.2d 931, 937, and cases cited; see Eads v. City of Carondelet, 42 Mo. 113; Missouri cases, 122 A.L.R., Annotation, pp. 1221, 1232 et seq.; Restatement of the Law of Contracts, sec. 26, p. 33. In the situation here where plaintiffs are required to prove their contract by clear, cogent and convincing evidence, to the reasonable satisfaction of the chancellor, and to establish their final right to remedy in the face of the statute of frauds and per-

---

1. As to whether the acts of notifying Hagale to vacate and tendering possession were such "performance" as to be referable and point unerringly to the contract claimed, or merely gave "color and meaning" to it, see 101 A.L.R. Annotation, p. 963, et seq.; Feste v. Bartlett, Mo.Sup., 269 S.W.2d 609, 614; Jones v. Linder, Mo.Sup., 247 S.W.2d 817, 820; Sportsman v. Halstead, 347 Mo. 286, 147 S.W.2d 447, 452; Scheerer v. Scheerer, 287 Mo. 92, 229 S.W. 192, 196; Hersman v. Hersman, 253 Mo. 175, 161 S.W. 800, 805; Kinney v. Murray, 170 Mo. 674, 71 S.W. 197, 202; Emmel v. Hayes, 102 Mo. 186, 14 S.W. 209, 211, 11 L.R.A. 323.

As to whether the promisor to be charged must be shown to have received *benefit* from such acts, see Jones v. Linder, Mo.Sup., 247 S.W.2d 817, and cases cited at loc. cit. 825; Schebaum v. Mersman, Mo.Sup., 191 S.W.2d 671, 675; Forrister v. Sullivan, 231 Mo. 345, 132 S.W. 722, 730; Collins v. Harrell, 219 Mo. 279, 118 S.W. 432, 441; Kirk v. Middlebrook, 201 Mo. 245, 100 S.W. 450, 462.

juries beyond "peradventure of a doubt," no presumption or inferences can be indulged to make a contract for them. Ellison said they "agreed," but this was his conclusion based on what had been said. He did not relate what *was said* and agreed to at this second meeting. He testified that when he left the second meeting he "believed" and "understood" an agreement had been made. But it is not a question of what one of the parties *concluded*; it is what was actually said and done. Brown v. Childers, Mo.App., 254 S.W.2d 275, 280, supra; Longmire v. Diagraph-Bradley Stencil Mach. Corp., Mo.App., 176 S.W.2d 635, 646. The subject of the discussion was not a matter of everyday, normal business, transacted as a routine affair. It was of sufficient importance to materially affect at least ten years of the future, the expression of the agreement concerning which is normally put into writing. The fact that Abramson requested Ellison to have his attorney prepare a lease does not argue that he assented to be bound as of the time of such request. Both parties were business men. It is not uncommon for one of the parties to a transaction of this kind to prepare his version or his ideas as to what the contract should be and submit it to the other party so that he or his attorney may make suggestions; and from these suggestions come the final negotiations which result in a completed contract. If Abramson was *already bound,* why have his lawyer go over it before signing? Why drag a dead horse to the veterinarian?

Secondly, did the plaintiffs prove the contract they sought to enforce? We consider the testimony of Ellison (principally on cross-examination) in reference to the contract he says was made as against the contract which he prays the court to require defendant to sign and perform.

*As to repairs:*

"Q. I believe you mentioned that you agreed on insurance, upkeep and taxes? A. Yes, sir, that is generally right.

"Q. What did you agree on upkeep? A. * * * On the inside of the building, if there was any major item to be taken care of, by that, I mean replacing a stool, or such as that, I would do that. Mr. Abramson would take care of the fuses, and light bulbs, and any leaky faucets, or minor items of repair that would have to be made.

"Q. You would do any major repairs, and they would do the minor repairs, is that right? A. That is about right, yes, sir."

The lease sought to be enforced provided in paragraph 4 that the lessors should maintain the roof and exterior walls in repair but should have no other or further duty or obligation with respect to maintenance or repairs on either exterior or interior of the building. Paragraph 5 provided that the lessee should maintain the interior in a good state of repair except for reasonable wear and tear, ordinary depreciation and act of God.

*As to restoration after fire loss:*

"Q. Was the understanding that you were to promptly restore the building, if it were destroyed by fire? A. If it were totally destroyed, I really don't remember what the conversation was, or if we had any, if it were totally destroyed.

"Q. Well, suppose it had been partially destroyed, what was your understanding? A. Well, it was my understanding that it would have to be repaired.

"Q. Within what time? A. There was no specific time set out, to the best of my knowledge. That would depend on how bad it was damaged.

"Q. Were you to do it promptly? A. Within a reasonable length of time, yes, sir. I fully realize that it would hold up his operations, if it were not repaired.

"Q. Was that your agreement with them? A. I would say yes."

Paragraph 8 of the lease provided that if the property or any portion be destroyed by fire or casualty so as to be rendered unfit, the rentals should stand suspended until the premises were rebuilt at full cost of lessors, but the lease did not contain any specific provision requiring the landlord to restore the premises.

 *As to the property leased,* plaintiffs' evidence showed that they leased their whole factory building to the defendant.

"Oh, one other thing that we had agreed on, the building, itself, is seventy-five feet long, and my lot is only sixty feet long, and I have a fifteen-foot area leased from the Missouri Pacific Railroad, and it was our agreement that I was to continue to pay the yearly lease on that extra part of ground."

The lease itself contained a demise of "all of the masonry building" (sometimes referred to as "the building") situate on Lots 7 and 8 in Block 13. It did not, at least specifically, cover any part or addition to the building which extended over the fifteen feet on Missouri Pacific property and did not provide for the payment of ground rent or maintenance of a right of enjoyment of said additional portion from the Missouri Pacific Railway Company. Plaintiffs have testified to a contract (if it was one) different in terms from the contract which they seek to require defendant to go forward with. The contract pleaded must be the contract proved. The court will not make a contract for the parties and then enforce it by decreeing specific performance. P. R. T. Investment Corp. v. Ranft, 363 Mo. 522, 252 S.W.2d 315, 316, and cases cited, supra; Schebaum v. Mersman, Mo.Sup., 191 S.W.2d 671, 674, supra; Selle v. Selle, 337 Mo. 1234, 88 S.W.2d 877; Walker v. Bohannan, 243 Mo. 119, 147 S.W. 1024, 1028, supra; Forrister v. Sullivan, 231 Mo. 345, 132 S.W. 722, 730, supra. "The proof must show, not only that *some* contract was made, but that the contract counted on in the bill was made. * * * There must be an absence of doubt or equivocation throughout the whole case in pleadings and proof. From end to end, it must be made out beyond a reasonable doubt". White v. Cochran, Mo.Sup., 248 S.W.2d 854, 855. We are of the opinion that plaintiffs' proof was not of that quality.

Plaintiffs assign error in the action of the court concerning portions of the depositions of Abramson and Weinsaft which were read into the record. The statements in these depositions were in substance and to the effect that defendant would have gone ahead and leased and moved into the building had it not been for the fact that its representatives learned that Hagale was not moving out of Reeds Spring; and

"Q. Did you ever ask Olyn Ellison whether Hagale was moving out of Reeds Spring? A. No, I don't believe I did say that. I asked, 'I understand he is moving out of town. We would be interested in moving in there.'

"Q. You said, as I understand it, 'I understand Hagale is moving out of Reeds Spring'? A. Correct, and 'if he moves out of Reeds Spring, we will be interested in moving into that building.'"

The witness said he did not investigate and did not ask Hagale, because he assumed that Hagale was moving out.

Defendant's counsel asked the court whether or not he might put in portions of the deposition to show "that the basis of the discussion was" the assumption that Hagale was moving out, also that the approval of the lease was conditioned upon its being submitted to and approved by defendant's counsel. The trial judge remarked that he did not consider the testimony which had been put in as admissions against "what I consider an issue in the lawsuit," and considered that an objection had been made to an offer of proof (it had not) and sustained the objection.

The testimony contained in the offer was before the trial court and is before us now. We are not convinced that the contract claimed and sought to be enforced was ever concluded. That being the case, the *reason* defendant failed to conclude it is immaterial.

The judgment is affirmed.

McDOWELL, P. J., concurs.

STONE, J., not sitting.